IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE BOARD OF TRUSTEES OF THE CITY
OF PONTIAC POLICE & FIRE
RETIREMENT SYSTEM,  On Behalf of Itself
and All Others Similarly Situated,

                    Plaintiff,

    vs.

NORTHERN TRUST INVESTMENTS, N.A.,
and THE NORTHERN TRUST COMPANY,

                    Defendants.

Civil Action No. 2:10-cv-11083
Hon. George Caram Steeh
Magistrate R. Steven Whalen

CLASS ACTION REPRESENTATION

DEMAND FOR JURY TRIAL

**CORRECTED CLASS ACTION COMPLAINT**

Plaintiff The Board of Trustees of the City of Pontiac Police and Fire Retirement System ("Plaintiff"), as trustee and administrator of its retirement plans and accounts (the "Plan"), on behalf of the Plan, and a class of all other similarly situated trustees, administrators, and other fiduciaries ("Class Members") of other similarly situated retirement plans ("Class Plans") (the Plan and the Class Plans may collectively be referred to as the "Plans"), brings this class action against Northern Trust Investments, N.A. ("NTI") and The Northern Trust Company ("NTC") (collectively "Northern Trust" or "Defendant") and states as follows:

**I.    SUMMARY OF THE ACTION**

1.    Plaintiff brings this action on behalf of a class that consists of all plans who owned securities in the Northern Trust Global Investments-Quantitative Management Collective Funds Trust ("NTGI-QM Trust") and were, pursuant to the Collective Fund Custody Agreement ("Custody

Agreement"), participants in Defendant's securities lending program which, through one or more of the collective investment vehicles managed by Defendant or its affiliates, incurred losses (the "Class").

2.     Defendant was a fiduciary of the Class Plans because it was under a duty to act for the benefit of the Class Plans on matters within the scope of their relationship.  Specifically, Defendant exercised authority and/or control with respect to the management of the Class Plans' assets, namely the investment of the Class Plans' collateral.

3.     As a fiduciary of the Class Plans, Northern Trust owed the Class Plans duties of good faith, loyalty, and avoidance of self-dealing as well as the duty to diversify the Collateral investment portfolio.  Northern Trust was required to discharge its obligations with respect to Class Members solely in the interest of Class Members while subordinating its own interests to those of the Class Members, for the exclusive purpose of providing benefits to Class Members, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of a similar enterprise with similar aims.

4.     Further, because Northern Trust exercised discretionary authority and/or control with respect to the management and/or disposition of the Class Members' assets, Defendant was a "fiduciary" to Class Members within the meaning of §3(21)(A) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §1002(21)(A).  As a fiduciary, Northern Trust was required by §404(a)(1) of ERISA, 29 U.S.C. §1104(a)(1), to discharge its obligations with respect to Class Members:  (a) solely in the interest of Class Members; (b) for the exclusive purpose of providing benefits to Class Members; (c) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

matters would use in the conduct of an enterprise of a like character and with like aims; and (d) in accordance with all applicable documents and instruments. *See* ERISA §404(a)(1), 29 U.S.C. §1104(a)(1).

5.     Defendant, as custodian and collective fund trustee of Plan assets invested pursuant to the Custody Agreement, is an investment fiduciary within the meaning of the Michigan Public Employee Retirement System Investment Act, Act No. 314 of the Public Acts of 1965, as amended ("PERSIA") because it exercised discretionary authority and/or control in the investment of the Class Plans' assets.  A true and correct copy of the Custody Agreement is attached hereto as **Exhibit 1**.  Michigan Compiled Laws ("MCL") §38.1132c Sec. 12 (c)(1).  As a fiduciary, Northern Trust is required by MCL §38.1133 Sec. 13 (3) to discharge its obligations with respect to Class Members: (a) solely in the interest of Class Members; (b) with the same care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a similar capacity and familiar with those matters would use in the conduct of a similar enterprise with similar aims; (c) with due regard for the management, reputation, and stability of the issuer and the character of the investments; and (d) for the exclusive purpose of providing benefits to Class Members.

6.     Defendant is also a collective fund trustee of Plan assets maintained under the Amendment and Restatement of Declaration of Trust of the Northern Trust Global Investments Quantitative Management Collective Funds Trust (the "NTGI-QM Declaration of Trust").  A true and correct copy of the NTGI-QM Declaration of Trust is attached hereto as **Exhibit 2**.

7.     Defendant, in violation of its inherent fiduciary duties under common law, by agreement, or otherwise, and those fiduciary duties set forth under ERISA and PERSIA, has engaged in imprudent and disloyal investment activities, namely, the imprudent and/or reckless investment of

3

Collateral in its securities lending program, which caused substantial losses to the Class Plans. This action seeks to recover losses caused by Defendant's breaches of its fiduciary duty to the Plans.

8.     Specifically, Defendant, in its capacity as agent and fiduciary for the Class Plans, invested collateral posted by investors who borrowed securities from the Class Plans in high risk securities in violation of guidelines and/or selected collective fund objectives that required Defendant to safeguard principal over all other considerations. Moreover, as negative information regarding these high risk investments became known or reasonably known to a sophisticated investment manager like Defendant, in violation of its fiduciary duties, failed to act to safeguard the Class Plans' collateral. When these high risk securities collapsed in value, the Class Plans lost principal and suffered substantial losses. Defendant made these high risk investments in an attempt to earn substantial profits for itself in dereliction of its duties to the Class Plans.

9.     Defendant's acts and omissions, as hereinafter described, are breaches of its inherent fiduciary duties under common law, by agreement, or otherwise, and its duties under PERSIA and ERISA §404(a) and are prohibited transactions that violate ERISA §406, which entitle the Class Plans, pursuant to ERISA §502(a)(2), to recover appropriate relief under ERISA §409 and, pursuant to ERISA §502(a)(3), to enjoin acts which violate ERISA. *See* 29 U.S.C. §§1104(a), 1106, 1132(a)(2)-(3), and 1109(a).

10.     Specifically, Defendant, in its capacity as agent and fiduciary for the Plans and Trustee of the NTGI-QM Trust, invested collateral posted by investors who borrowed securities from the Plans in several collective investment pools (the "Collateral Pools"), namely the Core USA Cash Collateral Section ("Core USA") and the Short-Term Extendable Portfolio ("STEP") pools, as well as various collective funds created by the NTGI-QM Trust, each of which, in turn, contained high risk and unsuitable securities. Upon information and belief, these investments were in direct

4

violation of express guidelines and/or selective collective fund objectives that required Defendant to safeguard principal over all other considerations and to manage the collateral investment risk in a manner commensurate with the Class Plans' participation in the various collective funds created under the NTGI-QM Trust.  When these high risk securities collapsed in value, the Plans lost both principal and profits that would have been earned but for Defendant's misconduct.  Defendant made these high risk investments in an attempt to earn substantial profits for itself in dereliction of its duties to the Plans.

## II.   PARTIES

11.     Plaintiff is the trustee and plan administrator of the City of Pontiac Police and Fire Retirement System, and is located at 47450 Woodward Avenue, Pontiac, Michigan.   It is a public pension fund established for the exclusive benefit of police, firemen and certain other employees of the Pontiac, Michigan Police and Fire forces.  The Plan serves over 370 retirees, and as of January 31, 2010 has over $222,162,472 in assets under management.

12.     Defendant The Northern Trust Company ("NTC") is a financial holding company based in Chicago, Illinois which does business in the State of Michigan.  Directly and/or through its affiliates, Northern Trust is a leading provider of investment management asset and fund administration, fiduciary and banking solutions for corporations, institutions and affluent individuals worldwide.  Northern Trust has offices in the United States, as well as international offices in Europe, the Middle East and the Asia-Pacific region.  As of September 30, 2009, Northern Trust had $78 billion in banking assets, $3.6 trillion in assets under custody, and $610.5 billion in assets under management.[1]

---

[1] http://www.northerntrust.com/pws/jsp/display2.jsp?TYPE=irLanding&XML=pages/ntirlanding /0802/1203536410667_429.xml last visited on November 30, 2009.

13.     Defendant Northern Trust Investments, N.A. ("NTI") has its principal place of business in Chicago, Illinois, but does business in the State of Michigan.  NTI acts as custodian to the custody account created for the purpose of facilitating investments in one or more collective funds.  NTI is also trustee to the NTGI-QM Trust and trustee to the various Collateral Pools and collective funds that invested cash collateral provided by borrowers in the securities lending program.

III.    **JURISDICTION AND VENUE**

14.     This Court has jurisdiction over this action and the Defendant pursuant to 28 U.S.C. §§1331 and 1332.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

15.     Venue of this action in the Eastern District of Michigan is proper pursuant to 28 U.S.C. §1391 because Defendant does business in this District, its breaches took place in the District, and the parties agreed to jurisdiction in this District.

IV.    **FACTUAL ALLEGATIONS**

16.     On or about July 19, 2004 Plaintiff, on behalf of the Plan, entered into a Custody Agreement wherein NTI was appointed as custodian to maintain in the name of the Plan a custody account for the purpose of facilitating investment in one or more collective funds maintained by NTI as collective fund trustee under the NTGI-QM Declaration of Trust.  Exh. 1.

17.     Pursuant to the Custody Agreement, NTI was to invest the Plan assets transferred to it as indicated according to separate written instruction (*see e.g.*, Exhibit B to the Custody Agreement) entitled "Designated Collective Funds."

18.     By later amendment, the Plan designated the following NTI collective funds for investment of its assets: 1) NTGI-QM Collective Daily Intermediate Government/Credit Bond Index Fund – Lending ("Bond Fund"); 2) NTGI-QM Collective Daily Russell 1000 Growth Equity Index

Fund – Lending ("Russel 1000 Growth Fund"); and 3) NTGI-QM Collective Daily Russell 1000 Value Equity Index Fund – Lending ("Russell 1000 Value Fund") (collectively, "Collective Funds").

19.     Pursuant to paragraph 8 of the Custody Agreement, the designated Collective Funds may participate in the Northern Trust securities lending program (*i.e.* "Lending Funds"). Exh. 1, ¶8. The Custody Agreement provides that "[a]ny such securities lending will be in accordance with Department of Labor Prohibited Transaction Class Exemption 81-6 and 82-63" and that Northern Trust would serve as the securities lending agent for the Lending Funds. *Id.* The Custody Agreement also provides:

> As compensation for such services, the Retirement System authorizes the payment by any Lending Fund in which Retirement System assets are invested of a monthly fee equal to 40% of the securities lending revenue earned by such Lending Fund (such revenue to be calculated net of rebates paid to the borrowers of securities and other expenses). If the Retirement System subsequently notifies NTI that it no longer desires Retirement System assets to be included in the securities lending program, NTI will cause such Retirement System assets to be redeemed from any Funds that lend securities within thirty (30) days following its receipt of such notice.

20.     The specific objectives of each of the Collective Funds, including, but not limited to, investment objectives, investment strategies, and participation in the securities lending program, was governed by individual Fund Declarations, defined *infra*.

21.     Upon information and belief, the Custody Agreement, amendments thereto, and Fund Declarations executed by and between Plaintiff and Defendant are materially similar to those executed by and between Defendant and members of the Class on behalf of the Class Plans.

22.     The NTGI-QM Declaration of Trust, originally effective November 22, 2002, and subsequently amended, provided that, unless otherwise specified, each of the designated funds "shall constitute a separate trust and the Trustee [NTI] shall hold, manage, administer, invest, distribute, account for, and otherwise deal with the assets of each Fund separately." Exh. 2, ¶3.01(b).

23.     Further, the NTGI-QM Declaration of Trust provided that "[t]he Trustee's determination as to whether any investment, investment technique, or strategy is within the class or classes of investments in which a Fund may invest, and as to whether any particular investment technique or strategy is consistent with the guidelines, policies, and objectives of a Fund, shall be conclusive.  The Trustee may invest the assets of any Fund in Units of any other Fund established under [the] Declaration of Trust or otherwise by the Trustee or a Bank where the Trustee, in its discretion, deems such investment to be appropriate and consistent with the investment guidelines, policies, objectives, and restrictions of the investing Fund." *Id*. ¶3.02.

24.     As a manager of the Fund, the NTGI-QM Declaration of Trust granted NTI:  1) exclusive management and investment authority with respect to the Trust and each Fund (*id*. ¶3.06); 2) the "rights, powers, and privileges of an absolute owner in the management and administration of the Trust" (*id*. ¶3.07); and 3) the authority to lend securities of the Trust in exchange for reasonable compensation of its services (*id*. ¶3.07(d)).

25.     While the NTGI-QM Declaration of Trust provides that NTI's liability for any loss in connection with the purchase, retention, sale or exchange of any investment is limited to those losses "caused by its own negligence, willful misconduct, or lack of good faith" (*id*. ¶5.02), it further states that "[n]o person dealing with the Trustee shall be under any obligation to inquire regarding the authority of the Trustee, the validity or propriety of any transaction, or the application of any payment made to the Trustee" (*id*. ¶5.04).

## A.     Northern Trust's Securities Lending Program

26.     Securities Lending refers to the lending of securities by one party to another. Generally, the terms of the loan are governed by a securities lending agreement and requires that the borrower provide the lender with collateral in the form of cash, government securities or a letter of

credit of value equal to or greater than the loaned securities.  The primary reason for borrowing securities are market making, hedging, and arbitrage trading purposes.

27.     Northern Trust began its securities lending program in 1981, and, upon  information and belief, by December 31, 2007, Northern Trust's securities lending program peaked when it boasted 664 clients, representing $1.13 trillion of lendable securities (from both custody clients as well as investment management clients).  Northern Trust attributes the success of the program to its "Relationship Management, Performance and Risk Management."[2]

28.     As an intermediary between the lender [the Plans] and the borrower and as an agent on behalf of the Plans, Northern Trust invests the collateral provided by the borrower in accordance with specific investment guidelines agreed upon between Northern Trust and the Plans.

29.     According to Northern Trust, the goal of the program is "to maximize current income to the extent consistent with the preservation of capital and maintenance of liquidity . . . ."  The prime objectives of the plan are "to emphasize liquidity and principal preservation."  *See* The Northern Trust Company Securities Lending Collateral Schedule, dated July 2007, (the "Guidelines") at 2, attached hereto as **Exhibit 3**.

30.     Despite the potential risks involved in securities lending, including borrower bankruptcy, collateral deficiencies, and challenges with settlements, corporate actions, or dividends and interest, Northern Trust nevertheless provided Plaintiff with a Request for Proposal in which Northern Trust boasted that its "clients have never experienced a collateral deficiency in the lending program."

---

[2] http://www.northerntrust.com/pws/jsp/display2.jsp?XML=pages/nt/0308/29007913_2904.xml last visited on November 30, 2009.

31.    In the Request for Proposal Northern Trust also extolled that "Risk management is the cornerstone of [its securities lending] program."

**B.    Northern Trust's Investments of Plan Collateral**

32.    Upon information and belief, through its securities lending program, Northern Trust lent pooled assets, including Plan Assets (*i.e.*, the Collateral), in exchange for collateral in the Collective Funds which was then invested in collateral pools such as the Core USA and STEP pools ("Collateral Pools").   Similar to the Guidelines which outlined the investment strategies and objectives of the Core USA and STEP pools, the strategies and objectives of each Collective Fund was governed by a separate fund declaration.

33.    The Core USA and STEP pools were available to clients of Northern Trust who participated in the securities lending program.  Northern Trust was required to invest the collateral according to the investment strategies provided by the Guidelines and/or objectives of the Collective Funds – that is, to ensure the safety of principal and preservation of capital.

34.    Upon information and belief, the collateral associated with the Russell 1000 Growth Fund and the Russell 1000 Value Fund was invested in Core USA and the collateral associated with the Bond Fund was invested in the Core USA and STEP pools.

35.    Participating Lenders in the Core USA pool receive cash, letters of credit, or government securities as Collateral for loans of their securities to approved borrowers. According to the Guidelines, "[t]he purpose of the Core USA pool is to provide custody of non-cash Collateral and, in the case of cash Collateral, the opportunity for a market rate of return consistent with allowed investment latitude and thereby seek to generate positive program spreads." Exh. 3, at 1.  The same Guidelines required that initial Collateral levels not be less than 102% of the Market Value of the Borrowed Securities, or not less than 105% if the Borrowed Securities and the Collateral are denominated in different currencies. *Id*.  Clearly stated in these Guidelines is that the investment

objective of the Core USA pool is to "seek[] to maximize current income to the extent consistent with the preservation of capital and maintenance of liquidity . . . ." *Id*. at 2.

36.     Similarly, the STEP pool is an ultra-short duration total return fund that attempts to outperform high grade, short term money market instruments. According to the NTGI Collective Short Term Extendable Portfolio Fund Declaration ("STEP Fund Declaration"), STEP is "designed for investors who seek higher returns than money market funds typically offer and who are willing to accept a variable unit value in order to achieve that objective." A true and correct copy of the STEP Fund Declaration is attached hereto as **Exhibit 4**.

37.     According to the NTGI-QM Collective Daily Russell 1000 Growth Index Fund – Lending, Fund Declaration ("Russell Growth Fund Declaration"), the Russell 1000 Growth Fund was maintained by NTI with the "objective of providing investment results that approximate the overall performance of the common stocks included in the Russell 1000 Growth Index." A true and correct copy of the Russell Growth Fund Declaration is attached hereto as **Exhibit 5**.

38.     The Russell 1000 Growth Index is a composite stock price index of common stocks selected by the Frank Russell Company (a financial service corporation unrelated to Northern Trust or any of its affiliates). The Russell 1000 Growth Index measures the performance of the large-cap value segment of the U.S. equity universe. It includes those Russell 1000 companies with higher price-to-book ratios and lower expected growth values. The Russell 1000 Growth Index is constructed to provide a comprehensive and unbiased barometer for the large-cap value segment. The Index is completely reconstituted annually to ensure new and growing equities are included and that the represented companies continue to reflect value characteristics.

39.     According to the Russell Growth Fund Declaration, Northern Trust, as lending agent, agreed "to indemnify, defend and hold harmless the Fund from and against any losses, damages,

costs and expenses . . . the Fund may incur as a result of the lending agent to perform its duties and responsibilities under the lending agreement in accordance with such agreement or applicable law." Exh. 5, ¶6.

40.     Similarly, the NTGI-QM Collective Daily Russell 1000 Value Index Fund – Lending, Fund Declaration ("Russell Value Fund Declaration"), states that the Russell 1000 Growth Fund was maintained by NTI with the "objective of providing investment results that approximate the overall performance of the common stocks included in the Russell 1000 Value Index."  A true and correct copy of the Russell Value Fund Declaration is attached hereto as **Exhibit 6**.

41.     The Russell 1000 Value Index is a composite stock price index of common stocks selected by the Frank Russell Company (a financial service corporation unrelated to Northern Trust or any of its affiliates).  The Russell 1000 Value Index measures the performance of the large-cap value segment of the U.S. equity universe.  It includes those Russell 1000 companies with lower price-to-book ratios and lower expected growth values.  The Russell 1000 Value Index is constructed to provide a comprehensive and unbiased barometer for the large-cap value segment.  The Index is completely reconstituted annually to ensure new and growing equities are included and that the represented companies continue to reflect value characteristics.

42.     According to the Russell Value Fund Declaration, Northern Trust, as lending agent, agreed "to indemnify, defend and hold harmless the Fund from and against any losses, damages, costs and expenses . . . the Fund may incur as a result of the lending agent to perform its duties and responsibilities under the lending agreement in accordance with such agreement or applicable law." Exh. 6,  ¶6.

43.     According to the NTGI-QM Collective Daily Intermediate Government/Credit Bond Index Fund – Lending, Fund Declaration ("Bond Fund Declaration"), the Bond Fund was maintained

by NTI with the "objective of providing investment results that approximate the overall performance of the Lehman Brothers Intermediate Government/Credit Index." A true and correct copy of the Bond Fund Declaration is attached hereto as **Exhibit 7**.

44.     The Lehman Brothers Intermediate Government/Credit Index is an unmanaged index that is widely recognized as a general measure of the performance in the intermediate-term government and corporate bond sector.

45.     According to the Bond Fund Declaration, Northern Trust, as lending agent, agreed "to indemnify, defend and hold harmless the Fund from and against any losses, damages, costs and expenses . . . the Fund may incur as a result of the lending agent to perform its duties and responsibilities under the lending agreement in accordance with such agreement or applicable law." Exh. 7, ¶6.

46.     The STEP Fund Declaration, Russell Growth Fund Declaration, Russell Value Fund Declaration, and Bond Fund Declaration are collectively referred to as "Fund Declarations."

47.     While the Russell 1000 Growth Fund and the Russell 1000 Value Fund were each set up to approximate the overall performance of their respective indices, neither Fund did so. Likewise, the Bond Fund was set up to track the Lehman Brothers Intermediate Government/Credit Index, which it failed to do.

48.     For example, according to the Portfolio Review of the Securities Lending & Investment Management Review for the Plan dated November 6, 2008, as of September 30, 2008 there was a tracking variance of -0.16 and -0.15 basis points to the Russell 100 Growth Fund and Russell 1000 Value Fund, respectively. As of the same date the tracking variance attributed to the Bond Fund totaled -0.54 basis points.

49. Therefore, had the Collateral Funds not been exposed to securities lending, they would have **earned** additional basis points rather than incurred the depicted loss.

50. According to the Appendix to the Securities Lending & Investment Management Review for the Plan, as of September 30, 2008, the collateral deficiency of the Core USA pool attributed to the Russell 1000 Value Fund was -0.27 basis points. The total deficiency caused an approximate $76,000 loss to the plan.

51. Likewise, as of September 30, 2008, the collateral deficiency of the Core USA pool attributed to the Russell 1000 Growth Fund was -0.27 basis points. The total deficiency caused an approximate $83,000 loss to the plan.

52. Finally, as of September 30, 2008, the collateral deficiency of the Core USA pool attributed to the Bond Fund was -0.65 basis points. The total deficiency caused an approximate $212,000 loss to the plan.

53. According to the Appendix, the issuers that most contributed to the negative return of the STEP portfolio were: Lehman Brothers, Morgan Stanley, Citigroup, Sigma, SLM, Wachovia Bank, Goldman Sachs, CIT, and Theta. The assets of the Core USA pool were impaired by its investments in Lehman Brothers and CIT Group floating rate notes.

54. The losses attributed to Northern Trust's imprudent investments of Plan assets in the Collateral Funds, as of September 30, 2008, totaled $371,000. Upon information and belief, the Class Plans suffered materially similar losses to those suffered by the Plan.

## V.    DEFENDANT'S FIDUCIARY DUTIES

55. As a fiduciary that exercised authority or control over the management or disposition of the assets of the Plan, the Collateral, and, upon information and belief, the assets of the Class Plans under ERISA §3 (21) (29 U.S.C. §1102 (21)), Northern Trust had the following duties pursuant to ERISA §404(a)(1) (29 U.S.C. §1104(a)(1)),

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

    (A) for the exclusive purpose of:

        (i) providing benefits to participants and their beneficiaries; and

        (ii) defraying reasonable expenses of administering the plan;

    (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

    (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

    (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

56.    Further, pursuant to the Agreement, the terms and provisions are to be construed and governed in accordance with the laws of the State of Michigan, thus Defendant's fiduciary duties also arise pursuant to MCL §38.1133 Sec. 13 (3) which provides, in pertinent part:

An investment fiduciary shall discharge his or her duties solely in the interest of the participants and the beneficiaries, and shall do all of the following:

    (a)    Act with the same care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a similar capacity and familiar with those matters would use in the conduct of a similar enterprise with similar aims.

    (b)    Act with due regard for the management, reputation, and stability of the issuer and the character of the particular investments being considered.

    (c)    Make investments for the exclusive purposes of providing benefits to participants and participants' beneficiaries, and of defraying reasonable expenses of investing the assets of the system.

    (d)    Give appropriate consideration to those facts and circumstances that the investment fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the

system's investments for which the investment fiduciary has responsibility; and act accordingly. For purposes of this subsection, "appropriate consideration" includes, but is not limited to, a determination by the investment fiduciary that a particular investment or investment course of action is reasonably designed, as part of the investments of the system, to further the purposes of the system, taking into consideration the risk of loss and the opportunity for gain or other return associated with the investment or investment course of action; and consideration of the following factors as they relate to the investment or investment course of action:

    (i)    The diversification of the investments of the system.

    (ii)    The liquidity and current return of the investments of the system relative to the anticipated cash flow requirements of the system.

    (iii)    The projected return of the investments of the system relative to the funding objectives of the system.

(e)    Give appropriate consideration to investments that would enhance the general welfare of this state and its citizens if those investments offer the safety and rate of return comparable to the other investments permitted under this act and available to the investment fiduciary at the time the investment decision is made.

(f)    Prepare and maintain written objectives, policies, and strategies with clearly defined accountability and responsibility for implementing and executing the system's investments.

(g)    Monitor the investment of the system's assets with regard to the limitations on those investments pursuant to this act. Upon discovery that an investment causes the system to exceed a limitation prescribed in this act, the investment fiduciary shall reallocate assets in a prudent manner in order to comply with the prescribed limitation.

## A.    Northern Trust Breached its Fiduciary Duties

57.    Despite its fiduciary obligations to Plaintiff, the Plan, the Class Plans, and members of the Class, Northern Trust invested the Collateral in the Collective Funds and the Collateral Pools in investments that were risky and in violation of the Guidelines and/or Fund Declarations in light of known (or what should have been known) existing market conditions, knowing that regardless of the investment outcome, the loss would be borne by the lender [the Plan and Class Plans]. Defendant

breached its fiduciary duties by making these investments and/or by failing to terminate those investments that it had previously made when they became imprudent.

58.     Northern Trust invested a large percentage of the Collateral in investments that were unduly risky because, for example, they were illiquid, highly-leveraged, or risky asset-backed securities, floating rate notes, structured investment vehicles and derivatives - investment vehicles that invested in asset-backed securities themselves.

59.     These investments were inappropriate for retirement plan investments and not contemplated by the Agreements, especially considering the relatively small gain the Plans could expect to receive from the securities lending program which had the overarching goal of emphasizing liquidity and preserving principal.

60.     Moreover, because NTI served as Trustee for the Collective Funds as well as the Collateral Pools in which they were invested, NTI owed and necessarily breached the fiduciary duty of loyalty.  This dual role created a conflict of interest which ultimately harmed the Plan and Class Plans.

### 1.     Investments in Lehman Brothers

61.     One of the investments made by Northern Trust in the Core USA and STEP pools, purportedly for the benefit of the Plans, was in Lehman Brothers Holdings, Inc., Lehman Brothers, Inc. and/or their respective affiliates (hereinafter "Lehman").

62.     It was widely known or should have been known among sophisticated investment managers that Lehman was a risky investment and that Lehman itself invested in risky asset-backed securities.

63.     Northern Trust made these perilous and improper investments despite myriad news accounts chronicling the risky nature of asset-backed securities beginning more than a year before the investments were made.

64.     For example, on December 12, 2006 – more than two years prior to the Plans'

losses – *The Wall Street Journal* raised red flags about investments in asset-backed securities:

> THE CRACK in the debt market's otherwise-strong foundation could be subprime mortgages.
>
> Investors have been gobbling up risky debt lately, from junk bonds issued by struggling auto makers to loans used to finance mega-buyouts.  But in subprime mortgages -- an especially risky corner of the debt market -- worries are keen.
>
> The $1.3 trillion subprime mortgage market, which is a bit more than a tenth of the overall mortgage market, caters to home buyers with scuffed credit records or who might have trouble paying off their mortgages.  Delinquencies on some of these loans are rising and some smaller lenders are folding, which affects debt that is backed by the loans.

65.     On February 13, 2007, *The Wall Street Journal* again wrote:

> ***While investing in asset-backed derivatives isn't new, the stakes are getting higher as a steady stream of negative news around these riskier investments is hammering this small corner of the credit markets.***
>
> The rising inability of subprime-mortgage borrowers to meet their payments amid higher interest rates has caused sharp spikes in the ABX index, the derivative index tracking subprime mortgages, as well as individual asset-backed derivatives linked to specific loan deals. That's because the cost of protecting these asset-backed securities against a possible default increases, leading to wider trading levels on the index.

66.     On April 4, 2007, *The Wall Street Journal* warned specifically about the types of

risky investments utilized by Northern Trust:

> Mutual funds are increasingly using complex financial products called derivatives to hedge their bets or boost their returns -- and that's raising concerns among regulators and fund watchdogs.
>
> Institutional investors such as hedge funds have long used derivatives, which include options, futures, swaps and other, more exotic fare.  But now these instruments are increasingly appearing in ordinary diversified stock and bond funds that often serve as core holdings for small investors.
>
> *                *                *
>
> ***Funds' use of derivatives -- which Warren Buffett once called "financial weapons of mass destruction" -- is growing as the instruments become easier to trade and as mutual funds aim to stand out in a crowded field.***  More automated trading of derivatives and increased use by fast-growing hedge funds have helped make the

18

market more accessible to mutual funds.  And with more than 8,000 mutual funds on the market, many managers believe it's not enough to match a market index.  They want to beat the market -- and derivatives often help.

While many newer, more-exotic mutual funds plainly advertise their derivatives strategies, the instruments may play an equally important, but less obvious, role in some plain-vanilla funds.  The AIM Income and Fidelity Investment Grade Bond funds, for example, have been around for decades and, at first glance, may look like straightforward bond portfolios.  But as of the end of February, the Fidelity fund had invested about 18% of its assets in futures, options and swaps, while roughly 70% of the AIM fund's assets were in derivatives.

Derivatives can be used to boost returns, increase yield, get access to more-exotic asset classes like commodities or simply reduce risk.  Indeed, many types of derivative-heavy funds thrived in recent years amid relatively placid markets.  But in recent weeks, as markets have gyrated more wildly, the vulnerability of some of these funds has become more apparent.

Many of these funds use an options strategy that generally works best in relatively flat markets, not one that's moving sharply up or down.  And some funds that use derivatives to produce returns that are a multiple of a selected market index saw sharp declines during the recent broad market downturn.

Another concern:  Many funds that employ derivatives strategies can hit fund investors with hefty tax bills, since these funds tend to trade often and can generate more short-term capital gains.

At the same time, the people responsible for overseeing mutual funds are raising concerns about derivatives.  ***"I am not trying to say that funds should not invest in these instruments, but I am saying that you should do a lot of work up front before you wade into uncharted territory,"*** said Securities and Exchange Commission investment-management division head Andrew Donohue last week, addressing a mutual-fund industry group, noting that "funds very often are newcomers" to derivative and other sophisticated instruments.

67.     News accounts continued throughout 2007 warning investors about the risks

associated with asset-backed securities.  On August 13, 2007 – over one year before Northern Trust

"broke the buck" (that is, the Core USA and STEP pool net asset values fell below $1 per share) –

*The Wall Street Journal* wrote that "[e]xotic financial instruments linked to subprime mortgages are

showing huge losses in debt markets and weighing on companies from lenders to banks to insurers."

68.   On March 17, 2008, Bear Stearns, the fifth-largest U.S. investment bank, was sold to JPMorgan Chase "for the investment-banking equivalent of pocket change," *BusinessWeek* reported the day after the collapse.  The same article stated that the takeover was causing Wall Street to worry "that the high-stakes game of dice the big firms were playing with asset-backed securities of dubious quality may force more players to exit the table."

69.   That being so, the market began to focus on the other "players" like Goldman Sachs and Morgan Stanley.  Particular attention, however, was paid to Lehman Brothers because of the similarity of its operations to those of Bear Stearns.  In fact, on the day of the Bear Stearns takeover, shares of Lehman "took a beating . . . because of the similarity of its business model to that of Bear Stearns."

70.   In the same article, entitled "Is Lehman Liquid Enough?" *BusinessWeek* reported:

As more hedge funds are forced to liquidate in the course of this year, . . . broker-dealers such as Lehman will get hit again because hedge funds won't be able to make good on the credit-default swaps they have with broker-dealers.  And that could make an already difficult year for Lehman even more unpleasant.

71.   *The Huffington Post* in an article entitled "Is Lehman Next?" also questioned the "possibility that Lehman will face a run like the one that brought down Bear Stearns."  The article reported that the market's "concerns were intensified when USB downgraded Lehman stock to neutral from buy . . . , and analysts at ING speculated that Lehman may not play a big enough role in the markets to justify a Fed-backed bailout like the one at Bear Stearns."

72.   As the months continued, the rumors that Lehman Brothers was following the same path as Bear Stearns continued to spread.  *The New York Post* reported on June 4, 2008 that "[t]raders are betting that Lehman Brothers could face Bear Stearns-style trouble" their "perception of risk is three times higher than [Lehman's] peers and is approaching the same level as when Bear Stearns collapsed."

73.     On July 22, 2008 *Bloomberg* reported:

Last year, as the market collapsed, Lehman underwrote more mortgage-backed securities than any other firm, accumulating an $85 billion portfolio, 44 percent more than Morgan Stanley's and almost four times the $22.5 billion of shareholder equity Lehman had as a buffer against losses.  Lehman saw trouble in the mortgage market as late as 2006 and still didn't move fast enough to reverse course, according to people familiar with the firm's internal workings.

74.     Based on all of these facts, Defendant, in the exercise of its fiduciary duties, should not have purchased or at the very least exercised its discretion to liquidate the Collateral investments in Lehman securities.

75.     On or about September 15, 2008, Northern Trust "broke the buck," when Lehman filed for bankruptcy, with unit prices falling below $1.00, eventually falling to $0.89 on March 31, 2009.

76.     The net asset value of the Core USA and STEP pools is maintained at a constant $1.00 basis.  Therefore, when the principal value of the Collateral held in the Core USA and STEP polls drops below the level required to pay the borrowers of the loaned securities, Defendant may declare that a "collateral deficiency" has occurred.

77.     On September 19, 2008, Defendant declared a collateral deficiency in the Core USA and STEP pools.  The Plans, and all other investors in the Core USA and STEP pools at that time had pro rata exposure to the losses suffered.

78.     Declaration of the collateral deficiency allowed Defendant to return the net asset value of the Core USA and STEP pools to $1.00, the amount necessary to repay borrowers. Defendant then posted an account payable to each of the plans that participated in the Core USA and STEP pools equal to each Plan's proportionate share of the collateral deficiency.

79.     Upon information and belief, the Class Plans have suffered materially similar losses.

### 2.       Other Risky Investments

80.     By August of 2007, market analysts were issuing warnings concerning the solvency of Structured Investment Vehicles ("SIVs"), another form of investment which it is believed Northern Trust purchased through the Core USA and Step pools.

81.     Two SIVs whose securities were held in STEP were Sigma Finance and Theta Finance – both created and managed by the United Kingdom-based investment management company, Gordian Knot; neither sponsored by a major financial institution.  Upon information and belief, other bank-sponsored SIVs were also held in the STEP portfolio.

82.     The warnings concerning the solvency of SIVs began because, as the market crashed that summer, the value of the long-term assets in SIVs' portfolios crashed with it.  At the same time, the market for Medium Term Notes ("MTNs") and commercial paper dried up.  As a result, SIVs were unable to issue debt to raise new funds.

83.     The warnings were issued after a subsidiary of Bear Stearns & Co. ("Bear Stearns") was forced to bail out two of its hedge funds.  The funds were shut down in August 2007.  The collapse of these funds kicked off a liquidity crisis that quickly spread to other SIVs.

84.     On August 22, 2007, in an article entitled "*SIVs, next shoe to drop in global credit crisis?*" *Reuters* reported:

> Wall Street should keep its eye on a little-known coterie of investment companies run by European banks called "structured investment vehicles," or *SIVs, which are having a tough time raising short-term funding*.  These *risky investment vehicles* raise cheap cash by issuing short-term debt called commercial paper and buy higher-yielding securities, often U.S. mortgages, pocketing the difference.
>
>      But analysts say *widespread failure in these vehicles* could mean higher borrowing costs for U.S.-based companies that rely on the asset-backed securities market.

The article noted: "According to Standard & Poor's, the largest SIV programs as of July 13 were Sigma Finance, run by Gordian Knot, a London-based firm that is 32 percent-owned by Deutsche Bank; Cullinan Finance, run by HSBC Bank; and K2 Corp., run by Dresdner Kleinwort."

85.     The article further explained:

> Money-market funds, which are big buyers of commercial paper, are spooked by possible contagion from subprime mortgages, or risky home loans granted to low-credit home buyers, and are shunning commercial paper backed by assets.
>
> As a result, ***SIVs can't raise any new funds and could soon be forced to dump more than $120 billion in investments*** – including higher-rated securities backed by mortgages and collateralized debt obligations, or bonds backed by other types of debt – on jittery investors who are already fleeing risk.
>
> Such a massive unwind could further batter the nearly frozen U.S. asset-backed securities market . . . .
>
> \*       \*       \*
>
> To be sure, SIV managers have a pile of emergency cash on hand and are pursuing other avenues, like short-term loans called repurchase agreements, to hoard more cash and wait out the investor boycott.
>
> But ***SIVs may not be able to wait longer than several weeks before unloading assets to repay investors***.

86.     On August 29, 2007, *The New York Times*, in an article entitled "S.&P. Cuts British Firm's Debt Rating," reported that Cheyne Capital Management, a SIV, had its ratings slashed and would likely be forced to liquidate its assets:

> A London money management firm, Cheyne Capital Management, may be forced to liquidate the assets backing its $10 billion commercial paper program in the latest casualty of the jittery credit market.
>
> Standard & Poor's, the rating agency, yesterday abruptly downgraded, by six notches, the ratings of the short-term notes issued by Cheyne Finance, a structured investment vehicle that the firm uses to bolster returns.
>
> \*       \*       \*
>
> The action was taken after the securities underlying Cheyne Finance's commercial paper program quickly declined in value, forcing it to liquidate some

assets in order to repay its creditors.  That process could begin as early as Thursday, when Cheyne's portfolio managers will estimate the proceeds from future asset sales.

87.     On September 6, 2007, a J.P. Morgan Securities Short-Term Fixed Income Research

Note by Alex Roever reported:

> **We believe that the survival of the SIV business model is in serious jeopardy** owing to the ongoing liquidity drought and the resulting difficulty SIVs face in issuing new debt.

*        *        *

> **The outlook for Structured Investment Vehicles (SIVs) is grim** . . . .  [T]he SIVs are heavily exposed to the general level of credit spreads; both as investors and issuers, and the substantial spread widening sustained during the past several weeks has hurt them on both sides of their balance sheets.

> The confluence of current market circumstances . . . **puts the SIVs under extraordinary pressure** . . . .  The negative headlines generated by the demise of several "SIV-lites" and now unwinding Cheyne Finance PLC have not helped matters.

88.     The J.P. Morgan Note listed Sigma as the largest SIV, with $53 billion outstanding.

89.     The Note further explained that negative disclosures regarding the outlook for SIVs

had created

> a new uncertainty . . . in the minds of investors as a response to recent agency actions – and inactions – in the Cheyne Finance case, as well as others.  The timing and magnitude of developments in this episode suggest the possibility that the very agents which investors rely upon most for SIV oversight may not have been completely focused on underlying asset valuations.  The result has been to undermine investor confidence in rating agency surveillance of SIVs.  These new doubts, piled upon what is already an incredibly challenging market, will make it harder for liquidity-driven investors to continue participating in the funding of senior debt on an ongoing basis.

90.     The Note also discussed market concern with the lack of visibility into the level of

risk in the portfolios of the SIVs, writing, "In the absence of clear disclosure the SIVs have allowed

speculation about the risks embedded in their portfolios to fester and grow."  It added, however, that

investors should be concerned because "*SIVs have probably sustained significant erosion in underlying asset values since the beginning of August*." The Note explained:

> The ability of SIVs to liquidate assets and shrink their portfolios is hampered by these resulting pricing implications. If a liquidating SIV begins selling these assets on the market in size, spreads will widen further and these $1-2 hits to asset prices will just be the tip of the iceberg.

> The latter point should be of *concern to SIV investors* . . . . If the liquidation value of the assets differs substantially from the values used to conduct capital adequacy tests or to measure NAVs, the funds available to repay investors could easily be compromised. The degree to which investors question the veracity of periodic marks-to-market undermines their confidence in the SIV business model as well as the value they place in a credit ratings process that uses market values as a key input.

91.     In particular, the Note explained:

> Moody's admitted it does not audit the quality of mark-to-market quotes used for market value calculations. The agency stated that it basically takes what the manager provides under the assumption that the manager is closely adhering to program documentation that outlines acceptable procedures for marking assets to market. Moody's claims to have turned down several requests to mark to model. Although Moody's professed confidence in the accuracy of the marks, its commentary only served to unnerve investors. The Reagan-era mantra of "trust but verify" is not at work here.

*       *       *

[As a result] [t]he investors who in the past have bought SIV senior debt are not now participating as actively in this sector as they were. Many of them are unlikely to return unless they can regain confidence in these assets and the ratings assigned to them.

92.     Regarding the use of repo agreements by SIVs to remain afloat, the Note explained:

Moody's noted that under certain conditions, use of repurchase agreements would be an acceptable financing strategy for SIVs, although *it admitted that the repo counterparty was essentially senior to the CP and MTN holders. We think this is an extraordinary accommodation, and reflects the degree to which Moody's is concerned about the viability of the SIV sector*. Our best information is that third-party repo is not generally available to SIVs on commercially acceptable terms, so this accommodation is really about making it easier for banks to support the SIVs that they manage.

25

93.     The Note detailed some of the problems inherent in the SIVs' use of repo agreements to fund maturing debt:

> This simple sounding solution is actually problematic to execute for at least two reasons.  First, not all of the assets owned by SIVs, such as the CDO or esoteric ABS positions, are items that Wall Street's repo desks are willing or able to finance.  With only some assets financeable, the amount of funding available using repo would be limited.   Second, ***it's doubtful the rating agencies would permit this sort of transaction because it would give the repo counterparty a preferential claim on the most liquid portfolio assets to the detriment of the senior debt holders.  Any repo that took place in the SIVs would need to be secured by a vertical slice of the portfolio*** . . . ***rather than claims on only the best assets***.

94.     The Note concluded that, absent some miraculous quick recovery by the market, the SIVs were doomed.  It explained that any potential solutions for SIVs were merely

> stop-gaps that would buy SIV more time in the event the market was slow to return to normal. ***In the end, the long-term viability of the SIVs is dependent on the short-term market returning to a normal functioning state in the not too distant future.  It is not currently clear to us that this type of recovery is imminent***.  As recent Federal Reserve data indicate, there has been a significant contraction of ABCP outstandings that we believe signifies a significant decrease in the degree of trust investors are willing to vest in ABCP in general.  The recovery of that trust and with it short duration investors' willingness to resume buying this paper ***will take longer to return***.

95.     On September 10, 2007, in an article entitled "Banks face billions in renewals," *The Globe and Mail* listed Sigma and other SIVs as in talks with banks to enter repo agreements to help pay maturing paper and avoid fire sales of their assets: "Structured-investment vehicles, known as SIVs, are in talks with banks to borrow against their own assets to obtain funding pacts known as repurchase agreements.  These so-called repo agreements could help pay maturing paper and to avoid fire sales of their assets, which include securities tied to U.S. mortgage loans."

96.     A September 18, 2007 article in *The New York Times* noted that many other SIVs faced problems similar to those of Cheyne, especially those without the backing of large banks to fill the short-term financing shortfall.

97.     And, indeed, by this time investors were so concerned about Sigma that they had essentially stopped buying its debt.  Upon information and belief, by October 18, 2007, with ***$22.5 billion in debt coming due in 2008***, Sigma was ***only able to raise $20 <u>million</u> in new MTNs*** to finance these quickly approaching obligations.

98.     With the value of their assets sinking, their debt coming due, and no ability to issue new debt to raise funds, the SIVs that were not declaring bankruptcy immediately were attempting to sell their assets (often at losses) and entering into repo agreements to raise the necessary funds to stay afloat.  But this approach was harmful to holders of SIV debt for several reasons.  First, the assets that investors were willing to buy from SIVs or to allow them to use as collateral for repo agreements were likely to be the highest quality assets in the SIVs portfolio.  This, in turn, diminished the overall quality of the SIVs' remaining portfolio and its ability to raise additional cash in the future using those remaining assets.  Second, the repo agreements gave the repo counterparties a claim to those higher quality assets that was senior to the claim held by the holders of SIV debt, including the Class Members.  As a result, were a SIV to fail, debt holders would be left only with the assets not already pledged to repo counterparties.

99.     As summer turned to fall, the bad news only got worse for holders of SIV debt.  Between August and October 2007, more than a dozen SIVs failed, following downgrades by rating agencies over the quality of their assets.

100.    On October 19, 2007, in an article entitled "Banks' Plan to Help May Itself Need Help," *The New York Times* reported that the problems with SIVs were so severe that Treasury was working on a proposal with the banks to buy the securities owned by the SIVs so that they would not cause the banks themselves to fail.  According to the article:  "The Treasury-supported proposal for the industry, however, provides a framework for a new fund to purchase assets held by structured

investment vehicles, or S.I.V.'s, that have been pressured since the credit market meltdown this summer.  It is intended to help the banks backing such vehicles avoid bringing those risky loans onto their balance sheets and to spare investors – including money market funds – distress."  The article reported that "[t]he creation of the fund, some investors said, seemed to indicate that problems were far worse for the banks backing the S.I.V.'s than they had thought."

101.    The article noted:

Yesterday, the big banks convened an organizational meeting at Citigroup's headquarters in Manhattan. Each bank will have about 15 executives take part in various committees.  A detailed proposal is expected in about two weeks, according to a person close to the situation.

So far, the banks agree on the larger goal: to restore stability and confidence to a vital pocket of the commercial paper market.  They are concerned that if all 30 S.I.V.'s, which hold about $320 billion in assets, began selling securities at once, prices would plummet and lead to a lending freeze.

\*       \*       \*

The new fund is intended to buy many of the securities owned by the S.I.V.'s, but at a cost.  A S.I.V. would pay a fee for the right to sell to the fund, and part of the fee would be passed along to the banks, increasing profits.

\*       \*       \*

Jim McDonald, a T. Rowe Price portfolio manager who holds commercial paper issued by four S.I.V.s, said his initial reaction was negative.  "Our credit analysts have more questions," he said.  "Their take on the whole thing is that the only benefit to this program is that it might give S.I.V.'s a longer time to sell their assets."

102.    On October 19, 2007, *NakedCapitalism*, in a report entitled "Citi Secures Interim Funding as SIV Plan Gets Jeered," wrote that the SIVs would benefit from the Treasury plan because it would "give them a nice infusion of cash."  The plan, however, would "be nothing other than a tool to obfuscate the balance sheets of SIV sponsors.  Or as one reader put it, ***rearranging the deck chairs on the Titanic***.  But even that view may be optimistic. Selling assets to the MLEC could be

seen as an admission of financial problems."  According to the report, "That alone would keep other SIV owners away."

103.    On October 20, 2007, *The Boston Globe*, in an article entitled "Banking on a bailout," blasted the SIV model as "***shades of Enron***." And if, by some chance, it was not already clear, *The Boston Globe* article also specifically warned Defendant that Sigma was in the same danger.  It wrote that the Citigroup bankers who "devised" the SIV "scheme" "later founded their own company, exquisitely named Gordian Knot Ltd., ***whose Sigma Finance investment vehicle is now on the hook for over $50 billion in risky assets***."

104.    But despite this flood of negative information about Sigma and the SIV market generally, Defendant did nothing to extricate Class Members' Collateral from the "high risk" Sigma investment.

105.    On October 22, 2007, a J.P. Morgan CDO Monitor report by Christopher Flanagan discussed the Treasury plan to buy assets from the SIVs, stating, "***we*** . . . ***still believe that the SIV business model is broken***, and that the implementation of today's agreement will not bring liquidity investors back to the SIVs on a going concern basis.  As a result, we believe the SIVs will continue to deliver in the coming months, keeping pressure on asset spreads."

106.    By October 26, 2007, writers for *Fortune* were wondering aloud whether money market funds had broken laws requiring investments with "'minimal credit risks'" by investing in SIVs, or what they called the "***shadowy debt funds that are now struggling***." In the article, entitled "Risky money market fund bets may be illegal: Money market funds may have broken a law dictating a conservative investment profile by investing in SIVs, reports Fortune's Peter Eavis," *Fortune* wrote:

Did mutual fund companies fall afoul of a key federal regulation by allowing their money market funds to buy securities issued by the ***shadowy debt funds that are now struggling***?

Money market funds are often the safest investments offered by fund companies, but several large money market funds own securities that were issued by structured investment vehicles (SIVs), the large, offshore funds that have recently made it into the headlines because the U.S. Treasury, along with Citigroup, Bank of America and JP Morgan Chase, are working on a plan to shore up [sic] them up.

\*        \*        \*

Securities regulations state that money market funds can only buy short-term, very safe securities. In particular, rule 2a-7, part of the Investment Company Act of 1940, says that money market funds can only hold securities that have "minimal credit risks."

***The fact that the SIVs are in trouble suggests that SIV securities had more than "minimal credit risks**.*"

107.    The article noted that "SIV exposure" was not an "industry-wide phenomenon" and that many investors had steered clear of the risky investments:

The issue here is whether money market funds should ever have been invested in SIV paper at all.

Some fund management companies that have large money market funds have very small SIV-related holdings, like BlackRock (under 0.5% of money market fund assets, according to a company spokesman) and Goldman Sachs and Vanguard, which have none, say company representatives.

In other words, certain money market funds chose to eschew SIV securities, which dispenses with the excuse that SIV exposure is an industry-wide phenomenon. Not everyone was into it.

108.    According to the article: "The argument for the defense of money market funds holding SIV paper goes something like the following. The SIVs that issue the notes are highly rated, well managed and have high quality balance sheets. Recently, they have been hit, almost unfairly, by an extraordinary panic in the credit markets that has led to a drop in demand for the notes the SIVs issue to fund themselves. And once the markets get back to normal, especially with the help of the Treasury, the SIVs will be fine." But, the article reports, this argument is far from convincing:

"Why isn't this approach convincing?  Remember the key test is whether the securities present minimal credit risk.  In this case, we have to ask whether the SIVs were actually strong enough to deserve the AAA rating, which usually only applies to entities with tiny amounts of credit risk.  That rating on a SIV implies that the SIV has the strength to get through almost any crisis.  The fact the SIVs stumbled so quickly shows that they weren't built with anywhere near enough capital or commitments of back-up funding."

109.    The article also concludes that the assets backing the SIV debt should not give investors comfort:

> The other defense argument is that the SIV notes are backed with assets, which means the holders won't take a big loss because they have a claim on those assets and the income they produce.  This is true, and it is a source of comfort for any poor money market funds holding SIV paper that does go into a liquidation process.
>
> But it'd be a stronger argument if the SIVs had actually made public what the assets are that back their paper.  What if those assets were loans or securities that are themselves distressed or very hard to sell?  If so, the holder of the SIV securities will end up getting back less than 100 cents on the dollar.
>
> But if a money market fund were to recoup the value of its SIV securities by claiming the underlying assets, wouldn't that allow the fund company to say that the SIV securities had "minimal credit risks" after all?  Are you crazy?
>
> Money market funds are supposed to [sic] the safest fund investments of all.  They're not supposed to get involved in liquidations.  That sort of event is a nightmare for a money market fund.

110.    On October 28, 2007, in an article entitled "Money-Market Fund Investors Fret About Their SIV Risk," *The Washington Post* reported: "Some money-market fund investors are again wondering if their investments are at risk because another complex investment product has fallen out of favor and become difficult to unload. . . .  Just as some money-market funds invested in subprime loans, some funds have lent money to what are called structured investment vehicles, or SIVs.  The SIVs take this money and put it in high-yielding risky investments like mortgage debt.  SIVs make money by collecting more interest on the risky debt than they pay to borrow it.  A distaste for any

type of investments deemed risky has hurt SIVs." The article further reported: "Some money-market funds got involved in SIVs by lending them money. Now, though, ***as it has become more difficult for the SIV wheel to keep spinning, some money-market fund managers have grown concerned that SIVs are less likely to repay the money they borrowed***." The article concludes that investors would not recoup their investments in SIVs. In fact, according to analysts, "***In terms of whether or not people are going to be made whole in their investments, I think the answer is pretty unequivocally no'* . . . .*"*

111. After the deluge of negative information and SIV failures, most funds had already begun their mass exodus from SIV debt. In November 2007, S&P reported that SIV exposures in its stability rated funds were down more than 40% during the prior two months. S&P noted that it expected to see continued decreases in exposures as well.

112. Likewise, on November 13, 2007, *Bloomberg* reported that "***[i]nvestors started fleeing SIV debt in August***." But unlike these funds, Northern Trust did nothing to protect the Collateral of Class Members.

113. The November 13, 2007 Bloomberg article also reported:

> ***The SIV crisis has raised questions about whether the debt vehicles are appropriate investments for money-market funds***. Vanguard Group, the fifth-largest U.S. manager of money funds, shunned them as too risky. New York-based ***Goldman Sachs Group Inc., the world's most profitable securities firm, dumped SIV debt on expectations the vehicles would be hurt by losses on subprime-mortgage securities***.
>
> ***"I'm sure, in hindsight, every manager wishes they hadn't" bought SIV debt, said Robert Plaze, an associate director in the investment management division at the U.S. Securities and Exchange Commission in Washington***.
>
> *          *          *
>
> ***Vanguard of Valley Forge, Pennsylvania, steered clear of SIV debt because it has "little or no" backstop financing from banks***, David Glocke, manager of the closely held firm's $97 billion Prime Money Market Fund, said in an e-mail.

"Without established bank lines that the SIVs can access to cover funding disruptions, they're at the mercy of the market," he said.

Goldman Sachs Asset Management said it sold "a very small position" in SIV debt earlier this year.

"SIVs are very sensitive to investor confidence," Elizabeth Anderson, co-chief investment officer for Goldman's Global Cash Business, said in an interview. "***We decided to sell over worries that things were going to get worse***."

114.    According to the article, ***Bank of America had to provide $300 million to a money-market fund that bought SIV debt*** and would have to give a similar aggregate amount to other funds: "The bank provided the support because of '***uncertainty around the value' of the SIV debt***."

115.    By the end of November, the market was informed that Sigma had been in distress since March 2007.  A November 30, 2007 *Asia Times* article, entitled "The Pathology of Debt," reported that Sigma along with several others were the "major players in the SIV market by the end of 2005."  The article disclosed that "***[a]s of March 2007, every one of the above SIVs was in distress***."

116.    That same day, other articles detailed the problems facing SIVs generally. *Morningstar UK*, in an article entitled "Demystifying a Credit Crisis Bogeyman: Everything you always wanted to know about SIVs, but were afraid to ask," wrote: "Among the various acronyms in the financial services world, ***the structured investment vehicle, or SIV, now has an evil ring to it*** because of its association with the credit crisis."  According to the article, "SIVs do pose some real risks."  In particular, "The funds take on both credit risk and liquidity risk.  Credit risk is the risk that the securities the fund holds drop in value.  The securities are the collateral for the SIV's debt.  So if the securities drop in value, the SIV might not be able to pay its creditors back.  Any hint that they might not get their money back is enough to make the SIV's lenders run for the hills.  And that could lead to liquidity problems.  Liquidity is the ability to sell your investments to willing buyers at a fair price.  Once the whiff of credit problems gets about, the willing buyers could head for the hills as

well, forcing you to sell your securities for much less than they are worth and leading to a permanent capital loss."

117.    In a section entitled "What Went Wrong with SIVs," the article explained that these risks had already come to pass: "This is exactly the scenario that has played out with SIVs in recent months.  Some SIVs hold subprime securities in their investment portfolios.  Although the percentages are not large and there have not been any losses yet, the hint of subprime exposure was enough to scare off the commercial paper buyers, the investors who normally lend the SIVs money. The threat of credit problems led to a liquidity crisis, and the SIVs have found it difficult or impossible to keep operating without constant sources of funding. Some had to sell assets at a loss." This was not as big of a problem for some SIVs who, the article explained, were backed by banks: "Many SIVs are backed by banks that agree to step in and cover a certain portion of any potential losses.  HSBC and Citigroup are among the top sponsors of SIVs."  The article also warned that the risky SIVs put the buyers of their debt in danger: "The other companies that may be affected are the asset managers who operate money market funds.  Money markets are major buyers of short-term debt issued by SIVs.  If the SIVs can't pay their debts, the companies who offer the money funds may have to reimburse the funds for any losses or suffer the reputational damage of sticking investors with the bill.  On the fund side of the equation, money markets and funds with large equity stakes in financials are two obvious areas that could be at further risk from SIVs and the subprime crisis in general."

118.    Many of the SIVs that collapsed in the fall of 2007 were subsidiaries of, or had been set up by, major banks.  As such, these banks – including Citigroup and HSBC – essentially absorbed their failures.

119.     As *Bloomberg* reported in February 2008, Sigma, however, was unique in that it had no investment or commercial bank backing it.  Sigma barely managed to survive through this period by:  (a) adding to its liquidity; (b) making use of repurchase agreements for financing; and (c) removing market-value triggers that forced the other SIVs to sell their assets as the values of their underlying assets declined, causing their failure.  Additionally, much of Sigma's outstanding debt was in the form of MTNs with a longer maturity date than most other funds, not maturing until the fall of 2008.

120.     Sigma's survival was contingent upon the use of repurchase agreements, which encumbered an overwhelming majority of its assets to the detriment of the Class Plans (because the Class Plans' interests were subordinated to the security interests of the repo counterparties), and the willingness of the repo counterparties to provide a continuous influx of money to Sigma collateralizing against Sigma's existing asset base.  This temporary survival strategy prolonged Sigma's collapse, but significantly increased its risk of failure.

121.     The *Financial Times* wrote on December 18, 2007 that Sigma had weathered the first SIV liquidity storm, but was certain to be caught up in a second liquidity storm when its MTNs came due.  The *Financial Times* article, entitled "***Second wave of SIV liquidity problems loom***," explained:

> ***The funding problems for the structured investment vehicles (SIVs) that have been at the centre of this year's liquidity troubles are far from over in spite of a number of banks stepping in to support their vehicles.***
>
> ***January will bring the start of a second wave of liquidity problems for SIVs as the vast majority of medium-term funding starts to come due for repayment***, according to a report from Dresdner Kleinwort analysts to be published tomorrow.
>
> SIVs rely on cheap, short-term debt to fund investments in longer-term, higher-yielding securities.  They have been hurt as funding has dried up and asset values have declined.

*     *     *

"Outstanding MTN for the 30 SIVs currently stands at $181bn, which will be the next liquidity challenge they face."

This funding represents almost 65 per cent of the value of the SIV sector by the middle of October.  Since then it is likely that SIVs have shrunk a great deal more and that that percentage is almost certainly higher.

According to the DrK analysts' calculations, two-thirds of all MTN funding for SIVs comes due for repayment by the end of next September.  Almost $40bn is to be repaid from January to March alone.

122.    According to the *Financial Times* article, Sigma was in some of the gravest danger from the second wave of liquidity problems: "This second liquidity squeeze will affect some SIVs more than others.  Sigma Finance, run by Gordian Knot, accounts for 22.5 per cent of all outstanding MTNs issued by SIVs. It must repay about $22.5bn by the end of September and another $2.5bn in the final quarter."

123.    Upon information and belief, in December 2007, S&P assigned a long-term negative outlook to Sigma.

124.    Therefore, as early as December 2007, analysts clearly foresaw and publicly announced that Sigma would face a liquidity crisis by the end of September 2008.

125.    In its 2007 Annual Report, for example, J.P. Morgan wrote that it had steered clear of SIVs because of their inherent risk: "We deliberately steered clear of most SIVs because we viewed them as arbitrage vehicles with plenty of risk, a limited business purpose and a flawed design . . . . SIVs will probably disappear . . . and the world will not miss them."

126.    Further, in J.P. Morgan's January 2008 publication entitled "Risk," it elaborated: "One of the most painful areas for some banks has been their exposure to structured investment vehicles (SIVs) – a sector that has imploded due to the refusal by asset-backed commercial paper investors to rollover short-term funding, combined with a plunge in the value of SIV structured credit portfolios.  Some banks, such as Citigroup, HSBC and Société Générale, have opted to

consolidate these vehicles on to their balance sheet, in the process taking what could be a nasty hit to capital levels.  JP Morgan, however, ditched its exposures to SIVs three years ago."

127.    Upon information and belief, a January 2008 Moody's Investors Services ("Moody's") report stated that the entire *SIV business model is now widely acknowledged as unsustainable* without restructuring.

128.    And the negative information just kept coming.  On January 8, 2008, the London Stock Exchange reported that Gordian Knot had decided not to renew its rating contract with Fitch Ratings (Derivative Fitch) in respect of ratings provided to Sigma.  The article reported that Fitch had rated Sigma since January 1995.

129.    By January 9, 2008, the reason for Gordian Knot's request that Fitch withdraw its rating of Sigma had come to light.  According to a *Business Wire* report of that date, "In December, Fitch requested additional information from Sigma on its liquidity and funding position" and was scheduled to meet with Sigma.  Tellingly, despite market concern about the lack of visibility into the quality of SIV assets, rather than provide the requested information, Sigma requested that Fitch withdraw its rating.  Fitch, however, reported that it did not plan to withdraw its rating and was "in the process of reviewing Sigma's ratings in light of current funding disruptions and the heightened stress experienced by a number of entities."

130.    By January 18, 2008, Fitch had placed Sigma on negative watch.  A *Euromoney Institutional Investor* article of that same date reported that "Fitch may downgrade nearly $32 billion of medium-term notes and $2.3 billion of commercial paper as a result of the action due to a lack of liquidity, term-funding and bank support."  The article noted: "This week has been unkind to the structured investment vehicle market."  Stefan Bund, the managing director of Fitch, *explained why Sigma was even riskier than most SIVs*: "*Sigma Finance is the only SIV rated by Fitch that does*

*not have a bank back-stopping it* . . . . '*Other comparable investment entities rated by Fitch have a bank backing them or have even less term mismatch*.'"

131.    A January 18, 2008 *Dow Jones* article discussed the consequences of ratings cuts: "Ratings cuts would make it harder for Sigma Finance to finance itself, potentially forcing it to sell assets to meet maturing debt."  The article reported that Fitch "*has concerns over the long-term viability of Sigma's funding strategy and its implications for senior investors* in the current market environment."

132.    On January 25, 2008, *Euromoney Institutional Investor* wrote that Fitch had highlighted Sigma's reliance on repo funding as a key issue.  The article explained: "Because repo counterparties hold on to SIVs assets during the life of the repo, they have more chance of getting their money back than other senior investors.  If a SIV could not repay a repo, the counterparty could just hold the assets. *This option is not available to normal senior investors who would be at risk in a fire sale*."

133.    As expected, the circumstances continued to deteriorate for Sigma after January 2008.

134.    In February 2008, *Euromoney Institutional Investor* wrote that Sigma "has run into the same problems of declining market value for high-quality assets that many SIVs have suffered from."

135.    On February 27, 2008, *Dow Jones* reported that Moody's might cut Sigma's rating because "'[o]verall market price deterioration, continued inability to issue senior debt and reliance on repos have *increased the company's risk profile*.'"

136.    Another *Dow Jones* article of the same date reported that Sigma "is facing further funding difficulties after a second ratings agency threatened to cut its top ratings and as market prices of its assets continue to decline."  According to the article, "Any ratings cuts would make it

harder for Sigma Finance to finance itself, potentially forcing it to sell assets to meet maturing debt." The article disclosed that "[s]ince July, Sigma Finance mainly has been financing its portfolio with repurchase agreements."

137.   Also in February 2008, the *Financial Times* reported: "Most other large SIVs are run by big banks, which have now stepped in to support their vehicles.  The lack of a large bank behind Sigma leaves it **vulnerable to collapse**."

138.   Meanwhile, other investors were acting on this flood of negative information and news by continuing to reduce their positions in Sigma.  For example, on February 29, 2008, J.P. Morgan reported that "Federated's positions in Sigma are being reduced.  Federated is actively reducing its positions in Sigma and other SIVs.  We expect substantially all SIV exposure will be eliminated by August 2008."

139.   Likewise, on March 14, 2008, a Fox-Pitt Kelton report regarding Chiba Bank wrote that "we acknowledge the likelihood that Chiba may incur further unrealized losses and possibly write-downs.  ***Of particular concern are the bank's SIV-like investments known as 'Sigma-Finance'.  According to numerous media outlets, as of February 2007, Gordian Knot's investment vehicle, Sigma, was running into funding challenges and Moody's was considering cutting the investment vehicle's rating*** . . . ."

140.   Still, Defendant did nothing to safeguard the assets of Class Members.

141.   On March 17, 2008, an article entitled "Gordian Knot's $40B Sigma Fund Faces Uncertain Future" reported that "Sigma has been described as the 'Sword of Damocles' hanging over the financial markets."  It explained, "As dozens of hedge funds and investment vehicles are flushed out of the 'shadow' banking system, the manager of the world's biggest structured investment vehicle is fighting for its future. . . . [T]he $40 billion Sigma Finance vehicle has to repay

or refinance roughly $12 billion in debt this year to keep funding its portfolio of asset-backed securities and bank debt – and at a time when buyers have gone on strike and are pulling back on lending." The article reported that "[t]he securities Sigma holds have plunged in value, making it tougher to secure new funding and putting its Triple-A credit ratings under threat." Moreover, Sigma "has been unable to issue any substantial new debt" and, as a result, "Gordian Knot has had little choice but to slowly unload its assets. It has mainly done this by entering agreements with investors to exchange the senior debt they hold for chunks of top-rated securities from its portfolio." Moreover, "Gordian Knot has also been talking to banks about substantially extending Sigma's use of repo lines. Moody's said Sigma has entered into $22 billion worth of repos over the past eight months." According to the report, Sigma was attempting to secure larger funding lines by "promis[ing] to favor those banks in future transactions." The report also concluded that "Sigma's longer-term future is in question."

142.    On March 18, 2008, *Dow Jones* reported that S&P had warned that it might cut Sigma's rating. The article noted that Sigma had $15 billion in debt coming due by June and that "S&P warned that Sigma Finance could face difficulty refinancing maturing debt, meeting margin calls or selling assets to decrease its need to borrow. . . . 'Sigma needs to continue to finance assets whose credit quality is backed by a weakening U.S. and global economy amid the disarray in the financing markets,' S&P said." The article reiterated that "[a] downgrade could make it harder or more expensive for Sigma Finance to raise funds and put more pressure on it to sell assets at a difficult time" and that Sigma "is the largest of a group of investment vehicles that have struggled since the summer to finance portfolios of bank debt and asset-backed securities." The article also disclosed that, according to S&P, Sigma had borrowings of $35 billion, or $11 for every $1 collected from investors.

143.    By March 19, 2008, as *Bloomberg* later reported, Sigma acknowledged that its ability to sell commercial paper had "diminished significantly."

144.    A March 28, 2008 *Euromoney Institutional Investor* report shed light on Sigma's exchanging of its assets for senior debt.  The report disclosed that Sigma had been allowing the parties to the exchanges to cherry pick the assets that they wanted to exchange for, rather than giving them a vertical slice of the entire portfolio: "Rather than using vertical slices to avoid crystallizing these losses, Sigma has mainly been exchanging assets for senior liabilities, said a source.  With this method, the assets do not need to be a representative sample of the portfolio, giving the investor more freedom to choose which assets to swap senior debt for. . . .  'Because the banks know the assets they'll get in return for putting up the money, they're much more comfortable than when putting a commitment into a variable portfolio.'"  While this arrangement allowed Sigma to come up with temporary funding to meet its obligations, it was damaging its long-term prospects because as the banks snagged the best assets from Sigma's portfolio, the overall quality of its remaining portfolio declined.  As the quality of the portfolio worsened, banks would be less likely to commit to future exchanges or repo agreements with assets as collateral.  And this practice increased the risk for Sigma's debt holders because, in the event of a liquidation, the assets left in the portfolio would be the assets that none of the banks or investors had wanted.

145.    Other investors continued to get rid of their risky SIV holdings.  On April 4, 2008, Credit Suisse reported that "Schwab continues to wind down its SIV exposure – we expect the current ~$2.5Bn will decline to fairly de minimis levels by August."

146.    And to no one's surprise, on April 4, 2008, both Moody's and S&P downgraded the MTNs issued by Sigma (in which the Class Members' Collateral was invested).  According to an April 4, 2008 *Dow Jones* article, the "***rating cut was sharper than expected when Moody's put the***

*ratings on review in February*."   The article reported that, in addition to putting the ratings on review for further downgrade, Moody's wrote, "'*Continuing uncertainties surrounding Sigma's ability to absorb the heightened and unprecedented levels of stress in the credit markets, coupled with further deterioration in Sigma's asset prices*, caused Moody's to revise its opinion to A2.'"   Moody's further explained that "[w]hile repurchase agreements provide much-needed liquidity, investors and repurchase counterparties could themselves come under liquidity pressure."

147.   Another *Dow Jones* article from the same day reported that the rating cut "*add[ed] to uncertainty over [Sigma's] future*."   According to the article, "the inherent mismatch in the tenure of [Sigma's] assets and liabilities mean it is *still vulnerable to an eventual collapse*."   The article reported:

> Moody's main concern is that Sigma Finance has been increasingly relying on short-term repurchase agreements and debt-for-asset exchanges with creditors to stay afloat.  The fund, which is structured as a 'limited purpose finance company,' hasn't been able to raise any significant longer-term financing since the credit crunch hit last summer.

> The agency said about $20 billion of maturing debt must be refinanced before the end of September.  Sigma can continue to add to its repo lines and to cut deals with investors on asset sales, but if those sources of liquidity were to dry up, it would potentially have to sell large chunks of assets at a loss in the open market.

> Since June, Sigma Finance has liquidated $9.5 billion in assets, at steadily declining prices.

148.   On April 7, 2008, J.P. Morgan explained that the market had understood the risk in Sigma long before the ratings cuts.  In the report, in a section entitled "Moody's cuts Sigma below Aaa: Really?"  J.P. Morgan blasted Moody's failure to lower the ratings sooner: "On Friday, Moody's lowered ratings on Sigma Finance's senior debt, with the short-term rating falling to P-2 and the long-term rating dropping 5 notches from Aaa to A2.  At this point we think the move says much more about Moody's than it does about Sigma."  Of particular concern to J.P. Morgan was the subordination of the debt resulting from repo agreements.  It wrote:

Given that the CP and MTN markets have been closed to Sigma since last fall, Moody's indicates that one of the things Sigma has done to bridge the gap between assets and senior debt is to rely more on repurchase agreements.  And it's with this point that we take exception, not with Sigma, but rather with the rating agencies.  ***Here you have an issuer that has effectively been locked out of its primary funding markets for months – markets that are unlikely to ever open to this kind of issuer again, for reasons having to do with the investor base.  In the absence of that funding, the issuer substitutes another form of short-term debt that it becomes increasingly reliant on, and which might have a super senior claim on some of the company's best assets.  Is the credit risk faced by Sigma's senior debt holders at the end of March 2008 the same as it was before August 2007?  Really?***

149.    According to the report, "The investors still holding Sigma are painfully aware of this.  For many of them the rating agencies lost credibility on this name long ago.  We don't believe that this rating downgrade really signals an increase in risk or increases the probability of an enforcement type event occurring in the near term.  Rather, we view it only as a long-overdue acknowledgement."

150.    Various sources continued to report that Sigma was having difficulty financing the $20 billion in debt that it had coming due in September 2008. Sigma would have to find a way to finance that $20 billion debt and more in order to ensure its survival before it even began to worry about the debt held by Defendant on behalf of Class Members, which would not come due until May 2009.  Despite this, Defendant showed no concern for the increasing risk to Class Members' Collateral.  On the other hand, according to *Euromoney Institutional Investor*, Sigma was the "***foremost concern among money market funds***."

151.    As a result, **money market funds had already reduced their investments in Sigma and rolled money into more conservative programs**.

152.    On April 8, 2008, The New York Times explained that the downgrades to Sigma MTNs were caused by the decreasing likelihood that Sigma could secure the $20 billion in funding it needed to stay afloat: "Gordian's Sigma Finance Corp. **must refinance $20 billion of debt by September in a market where even the biggest banks are struggling to borrow**, according to

43

Moody's Investors Service.  Moody's cut the $40 billion fund's Aaa rating by five levels to A2 last week because of **concern about Sigma's ability to weather the credit crunch**.  Standard & Poor's downgraded Sigma on Monday to AA- from AAA.  **The inability to replace the debt may cause Sigma to dissolve**. . . .  [Sigma] has dodged the turmoil by finding financing alternatives after demand for the industry's primary source of cash, commercial paper, dried up.  A failure would signal a credit market freeze that began in July [2007] and led to the collapse of Bear Stearns isn't close to ending . . . ."

153.    Also on April 8, 2008, *Dow Jones* reported that Sigma had "***suffered another blow to its chances for survival***."  The article noted that "[a]nalysts are predicting that Sigma Finance will probably have to wind down its portfolio, marking the end of a structure that was copied by dozens of banks and asset managers."  The article also explained that part of the risk of the repo lines was that "lenders can demand more collateral to keep the financing in place, a scenario that can potentially lead to default."

154.    On April 9, 2008, *The Wall Street Journal Europe* reported that Sigma would "find it difficult to issue commercial paper or bonds with anything less than the top rating."  It also noted that the "value of its underlying assets has slid because of the credit crunch that began last summer."

155.    On April 10, 2008, *breakingviews.com*, in an article entitled "Gordian Knot's SIV starting to look frayed," reported that "***[t]he last structured investment vehicle left on its own two feet has been pushed nearer the edge***."  The article noted that the downgrades by Moody's and S&P come "at a delicate time.  The vehicle is about to refinance half its $40bn debt.  That's a big call in these markets."  The article noted that Sigma had outperformed other SIVs, "[b]ut staying ahead of the pack isn't such a comfort when peers have performed so badly.  They have either folded, like Cheyne Capital's Cheyne Finance vehicle, or fallen back on bank sponsors, like HSBC's Cullinan."

The article also reported that *Sigma "has gone particularly heavy into the repo market, where it has pledged $14bn of assets to 17 counterparties*."   In order to survive, the article concluded, "*Sigma needs to keep pulling rabbits out of the hat over the next few months*."

156.   On April 11, 2008, *Euromoney Institutional Investor* reported that Sigma "*faces a struggle*" to refinance the necessary $20bn in debt by September after the ratings cut and characterized it as "*a massive hurdle for Gordian Knot to overcome*."   The article characterized Sigma as "the latest, and the last, victim of the virus which spread through the SIV sector after the ABCP market became a hot spot of the credit crisis last summer."   The article disclosed that Moody's had warned that repo funding and asset exchanges "may not be sustainable ways for the vehicle to fund."   Indeed, "Moody's [said] that 'continued weakness in [Sigma's] liquidity position, crystallisation of mark-to-market losses or deterioration in portfolio credit quality' could send Sigma into a natural amortization state while S&P says that the vehicle has come close to triggering this state."   The article noted that most investors had already fled the SIV market: "'Apart from the investors holding Sigma paper, the market has reacted calmly,' said a London-based CP head.  'This goes to show you how little investor participation there is in the sector now.  *Investors have largely exited SIVs and conduits and made a flight to quality*.'"

157.   On April 18, 2008, Fox-Pitt Kelton corroborated the flight of investors from SIVs, reporting that Charles Schwab Corp. "*continues to reduce its exposure to SIVs* . . . .  *Exposure to Sigma Finance is just 0.14% and will be eliminated by the end of Apr*."

158.   On April 23, 2008, *The Wall Street Journal* reported that the ratings downgrades "*called [Sigma's] survival into question*."

159.   Then, upon information and belief, Sigma engaged in $26 billion in repo financing and sold assets in an attempt to temporarily survive.

160.     On July 14, 2008, *Dow Jones* reported that Moody's had cut Sigma's debt rating "and said it may cut the rating again, citing ongoing volatility in the credit markets."  The article noted that Sigma had gained two additional repo counterparties, increasing the number of third parties with senior claims to the Class Plans' Collateral investment to 19.  Moreover, those repo counterparties were cherry picking the best assets, increasing the risk to investors and limiting Sigma's capacity for additional repo transactions: "Repo counterparties also have a strong preference for certain asset types, which limits the capacity for more repo transactions, Moody's said.  Sigma might have to liquidate more assets if repos and ratio trades cannot fill all its financing needs, the rating agency said."

161.     That same day, *Dow Jones*, in an article entitled "Sigma Finance $26B SIV Faces Further Funding Squeeze," disclosed: "Moody's Monday said market prices on Sigma's assets – which include bank bonds, collateralized debt obligations and mortgage-backed securities – have continued to deteriorate, putting pressure on Sigma's ability to keep raising money to repay maturing debt. . . .  According to Moody's, the majority of Sigma Finance's portfolio, or about $14.7 billion, is being financed through repurchase agreements that involve posting the investment assets as collateral with lending counterparties. . . .  The fund has also been selling assets on the open market, though at increasingly lower prices."

162.     On August 1, 2008, *Reuters* reported that Sigma's creditors were looking for an advisor "amid ***concerns about the company's ability to pay its debts***."  According to the article, a recent Citibank report explained: "Should any of the repo counterparties withdraw its funding (that is, not renew its repo agreement) or demand greater haircuts, there does not seem to be much room for manoeuvring [sic]."

163.    On September 12, 2008, *Thomson Financial News* reported that S&P had further downgraded Sigma's issuer credit and senior debt ratings, "reflecting the ongoing challenges in the credit markets, the potential side effects of repurchase financing, the absence of new third-party capital investment, and the updated results of our stress-case scenario analysis."  The article disclosed that "***S&P has a negative outlook on the company***."

164.    On September 22, 2008, HSBC wrote that "[w]e are particularly nervous about the fate of the last remaining SIV, Sigma Finance."

165.    As this deluge of negative information continued unabated, other investors were exiting their investment in Sigma en masse.  In fact, ***money market funds, which still held as much as $5 billion in Sigma debt as of April 2008, had no holdings in Sigma debt by the end of September 2008***.

166.    And these investors were recouping almost their entire investment in Sigma.  In fact, even as late as September 2008, Sigma's debt holders were able to sell their notes with minimal losses.  For example, on September 12, 2008, the Orange County California Treasurer's Office took "timely action to protect Orange County Schools, Cities, Agencies and County government from a devastating investment loss."  ***On Friday, September 12, 2008, the Treasurer's Office sold all of its investment in the Sigma floating-lien MTNs for 91.5 cents on the dollar, saving the Office from a $50 million loss***.

167.    Even after all of the negative publicity, however, Defendant took no similar action to protect Class Members.  As a result, upon information and belief, Class Members' Collateral was still invested in Sigma when, as had been predicted for almost a year, it failed on October 1, 2008.

168.    On September 29, 2008, J.P. Morgan, one of Sigma's repo counterparties, terminated its repo agreement and served Sigma with a notice of default because Sigma could not provide

sufficient collateral to J.P. Morgan in response to a margin call (prompted by a decline in value of the securities J.P. Morgan held as collateral).

169.    Following J.P. Morgan, HSBC and Royal Bank of Scotland also terminated their repurchase agreements with Sigma.

170.    As a result, these lenders seized the assets they held under the repurchase agreements. The defaults allowed Sigma's repo counterparties to sell the securities they held pursuant to the repo agreements.  Again, Defendant failed to exercise its discretion to liquidate the Collateral investment in Sigma.

171.    On September 30, 2008, Moody's and S&P downgraded Sigma on this news and warned that investors in roughly $6 billion of Sigma's remaining debt (which included the MTNs) may not get their money back.

172.    At the time of default, 92.5% of Sigma's assets were held by counterparties to Sigma's repo agreements.  And as predicted, these lenders seized the assets that they held under the repo agreements, leaving woefully inadequate assets to satisfy MTN holders.  In fact, of Sigma's approximately $27 billion in face value of assets, approximately $25 billion had been seized as repo collateral, which left approximately $1.9 billion in face value of unencumbered assets backing approximately $6.2 billion in outstanding senior secured liabilities (primarily MTNs).

173.    An October 1, 2008 *Bloomberg* article, entitled "Sigma Finance Plans to Stop Trading, Making Payments," reported that  "Sigma Finance Corp., the last of the companies known as structured investment vehicles," had stopped trading. ***But, armed with the disclosures of the past year, many investors had gotten out of their Sigma investments.  The article reported that "Money-market funds in the U.S. have no holdings of Sigma debt, down from about $5 billion as of April, according to S&P.  'That is usually a good representation of the entire market*,**'** Peter

Rizzo, director of fund services at S&P in New York, said in an interview." The article also disclosed, as the market had been warning for months, that investors still holding Sigma debt were unlikely to recoup the majority of their investment because of the seniority of repo holders: "Sigma posted $25 billion of its assets to banks under the repurchase agreements, known as repos, leaving $2 billion to repay $5.9 billion of bonds, Moody's said. The value of the assets has slumped amid a seizure in credit markets. 'It's not clear whether the senior debt investors will be able to get any more than the $2 billion of assets in the company currently,' Moody's analyst Henry Tabe said in an interview today. 'And even if Sigma were to liquidate that $2 billion, they may not get anything close to that amount.'"

174.    On October 2, 2008, UniCredit's Daily Credit Briefing reported:

> The last SIV standing tumbles . . . . SIGMA has survived until now only by getting banks to lend to it via repos. Sigma's assets account for about USD 27 bn, with 92.5% thereof (USD 25 bn) held under repo agreements . . . . Sigma's ability to engage in further repos was hindered by market value declines on the portfolio as well as a reduction in the types of assets favored by repo counterparties. According to Moody's, it is not sure whether the senior debt investors will be able to get any more than the USD 2 bn of assets currently in the company. And even if Sigma were to liquidate that USD 2 bn, it may not get anything close to that amount . . . .

175.    On October 3, 2008, Oppenheim Research scolded Zurich Financial Services for its failure to sell its position in Sigma before its fall: "[A]lready back in March 2008 S&P wrote that it will lower Sigma's rating. It is interesting to see that US money market funds have no holdings of Sigma debt, down from about USD5bn as of April 2008. One can conclude that there was a market for these assets but ZFS' risk management has underestimated the default risk. . . . Senior creditors are expected to get some 15-20% of par in a best-case scenario."

176.    By October 6, 2008, Sigma was in receivership, with receivers appointed to wind up its affairs. On December 2, 2008, the receivers held an auction sale of Sigma's debt securities, selling them for $306 million. The receivers estimated that Sigma's obligation to MTN holders was

approximately $6.2 billion and that MTNs maturing after October 23, 2008 would not be satisfied from any such proceeds.

177.    As of December 2008, the Sigma MTNs have lost approximately 97% of their value. Upon information and belief, the Plan and Class Plans have sustained significant losses in collateral and lost profits as a result of Defendant's investment of Collateral in Sigma. The matter in controversy exceeds the sum of $5,000,000.

**B.      The Plans Losses are a Direct Result of Defendant's Breaches**

178.    Despite the avalanche of warnings about the risky nature of these investments known to or reasonably known by a sophisticated investment manager like Defendant, and in conflict with the stated and agreed investment goals and objectives of the Custody Agreement, Guidelines and/or Fund Declarations, Northern Trust continued to invest the Plans' funds in Lehman, Sigma, Theta and other risky investments well into 2008.

179.    In stark contrast to and in violation of its express duty to use expertise in investing, Northern Trust invested the Collateral in ventures such as Lehman, Sigma, Theta and other risky investments despite wide spread and consistent public knowledge available to sophisticated investment managers like Northern Trust that such investments were inherently risky beyond that sanctioned under the Agreement, Guidelines and/or the Fund Declarations.

180.    Under these circumstances, when the overarching goal was to preserve principal and maintain adequate liquidity to be able to return Collateral to borrowers – an expected and inevitable requirement in any securities lending program – a reasonably prudent fiduciary would not have made the hazardous investment decisions made by Northern Trust. Indeed, in the face of known (or what should have been known) market conditions, a reasonably prudent fiduciary would not have had such a large exposure to asset-backed securities and floating rate notes, and instead would have invested in safer vehicles.

181.    Moreover, a reasonably prudent fiduciary would have ensured that liquidity standards were maintained to further reduce the potential downside exposure to the Plans.

182.    Finally, when it became known (or should have been known) by a sophisticated investment manager like Northern Trust that the Collateral was at risk of loss and in danger of losing principal or becoming illiquid, a reasonably prudent fiduciary would have taken affirmative steps to preserve the Collateral to protect the Plans.

183.    Defendant's failure to comply with its obligations set forth in the Agreement, Guidelines and/or the Fund Declarations, in direct violation of Defendant's duties of loyalty and prudence, directly harmed the Plan and, upon information and belief, the Class Plans, in that the Collateral not only earned less than it would have earned if invested by a reasonably prudent fiduciary, but also lost principal.

184.    Upon information and belief, Northern Trust knew that it had no risk of loss but was paid a percentage of any profit and, therefore, had placed the entire risk of its reckless investment strategy on the Plans.  Because of this "heads I win, tails you lose" paradigm, Northern Trust had no incentive to modify its unauthorized and inherently risky investment strategy, and made not one attempt to do so, because it was the beneficiary of all profits, and would not be responsible for any losses.

185.    Northern Trust's incentives were diametrically opposed to Northern Trust's fiduciary obligations to Plaintiff, the Plan, the Class Plans, and Class Members.

186.    Northern Trust made the foregoing high risk investments solely to maximize its own profits and in express dereliction of its fiduciary duties.  As a result of Defendant's actions, Plaintiff and the Plans suffered substantial losses.

**C.     Northern Trust's Efforts to deal with the Collateral Deficiency**

187.    Following the Collateral Deficiency announcement, presumably anticipating the desire of the Plans to terminate their loans, the September 2008 Securities Lending Update announced, for the first time, that the participating lenders would be able to exit the securities lending program "in two ways: A staged withdrawal or an immediate in-kind distribution."

188.    In choosing the Staged Withdrawal option, the Plans would be able to recover a fixed dollar amount determined by a fixed percentage of their pro rata share of the Core USA and STEP pools overnight invested cash, established as of the close of business on or about September 18, 2008 during a twelve (12) week period.  At the end of the 12 week period, the Plan would be approximately 35-60% withdrawn from the lending program – the remainder of the withdrawal was expected to require up to an additional nine (9) months.

189.    To participate in the Immediate In-Kind Withdrawal, "[f]unds must be provided by the client to pay the full amount of cash collateral (including the payable) owed to the borrower to facilitate return of the securities on loan in order to initiate the loan recall process."

190.    Effective January 20, 2009, Defendant began offering a third redemption alternative to allow for cash redemptions.  In order to participate in a cash redemption Defendant, "in its sole discretion, will determine that sufficient liquidity exists in the applicable collateral vehicle to fund those redemptions . . . ."  But any timely requests will be capped at 15% or $1 million, whichever is greater, and cash redemptions will be provided pro rata across all clients making requests and, again, depending on the available liquidity.  Any unfulfilled portion of a redemption request will be deemed to have been withdrawn and a new request must then be made.

191.    To be clear, Northern Trust will not return the Plans' securities in kind or in cash.

192.    Continuing to this day, certain of the investments in the Collective Funds and the Collateral Pools:  (a) have defaulted; and (b) have been marked down in value and/or, on information

and belief, have become so illiquid that such investments only could be sold, if at all, substantially below the values at which they are carried.

193.    On information and belief, the Core USA and STEP pools are at a significant risk of incurring additional losses resulting from:  (i) additional defaults of securities held in the Core USA and STEP pools; (ii) additional declines in the value of securities held in the Core USA and STEP pools; and, (iii) the realization of losses upon the sale of securities held in the Core USA and STEP pools necessitated by the repayment of securities loans.

## VI.   CLASS ACTION ALLEGATIONS

194.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class of all trustees, administrators, and other fiduciaries of retirement plans which entered into Custody Agreements with Northern Trust who participated in securities lending through the:  1) NTGI-QM Collective Daily Intermediate Government/Credit Bond Index Fund – Lending; 2) NTGI-QM Collective Daily Russell 1000 Growth Equity Index Fund – Lending; and 3) NTGI-QM Collective Daily Russell 1000 Value Equity Index Fund – Lending, and whose Collateral was invested by Northern Trust (the "Class") in the Core USA and STEP pools.  Excluded from the Class are:  (a) Defendant; (b) the subsidiaries and affiliates of Defendant; (c) any person or entity who is a partner, executive officer, director or controlling person of Defendant; (d) any entity in which Defendant has controlling interest; (e) Defendant's directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (f) the legal representatives, heirs, successors and assigns of any such excluded party.

195.    As of June 30, 2009, the market value of the securities available to be loaned and managed by Northern Trust totaled approximately $3.6 trillion.  While the exact number of Class Members is unknown to Plaintiff at this time, Plaintiff believes and therefore avers that Class Members number in the thousands.

196.     Plaintiff's claims are typical of the claims of the members of the Class in that, upon information and belief, all Class Members entered into identical or virtually identical Custody Agreements with Northern Trust on behalf of Class Plans which held Collateral in the Collective Funds and the Collateral Pools and sustained damages as a result of Defendant's wrongful conduct complained of herein.

197.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class litigation.  Plaintiff has no interests that are adverse or antagonistic to the Class.

198.     Plaintiff anticipates that there will be no difficulty in the management of this litigation as a class action.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by any individual Class Plan may be relatively small, and Plaintiff seeks injunctive relief, the expense and burden of individual litigation make it impracticable for Class Members individually to seek redress for the wrongful conduct alleged herein.  Further, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class and the Class Plans which would establish incompatible standards of conduct for the party opposing the Class.

199.     Defendant has acted on grounds generally applicable to the Class and the Class Plans with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

200.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: (1) whether Defendant is a fiduciary; (2) whether

Defendant violated its obligations set forth in the Custody Agreement, Guidelines and/or Fund Declarations; (3) whether Defendant violated its fiduciary duties of prudence and/or loyalty; (4) whether Defendant engaged in prohibited transactions in connection with Collateral investments; (5) whether the Plan and the Class Plans suffered any losses as a result of Defendant's actions; and (6) whether Plaintiff and the Class would suffer irreparable injury by the continuation of Defendant's conduct complained of herein.

201.    On information and belief, the names and addresses of those persons and entities that held shares in the Collective Funds and the Collateral Pools are available from Defendant.  Notice may be provided to such Class Members via first class mail using techniques and a form of notice similar to those customarily used in class actions.

**A.    First Cause of Action:  Violation of Duty of Care Based on ERISA §404 (29 U.S.C. §1104)**

202.    Plaintiff repeats and realleges the allegations contained in paragraphs 1-201 as if fully set forth herein.

203.    At all relevant times, Defendant acted as a fiduciary within the meaning of ERISA §3(21)(A) (29 U.S.C. §1002(21)(A)) by exercising authority or control with respect to the management or disposition of the Collateral, a Plan asset.

204.    Defendant had a duty to invest the Collateral for the benefit of the Plans prudently based on the standards of a reasonably prudent fiduciary.

205.    Defendant had a duty of loyalty to invest the Collateral solely in the exclusive interests of the Plans and their participants and beneficiaries and for the exclusive purpose of providing retirement benefits.

206.    To the extent that the Custody Agreement, Guidelines and/or Fund Declarations required Defendant to invest the Collateral imprudently, Defendant also had a duty to disregard those

requirements and invest the Collateral prudently. Defendant could not blindly follow those requirements if doing so would cause harm to the Plans.

207. Defendant had a duty to monitor the Collateral investments continuously to ensure that they were at all times proper. If a Collateral investment became imprudent or improper, Defendant had a duty to act immediately to protect the Plans from any investment harm by, *inter alia*, liquidating the Collateral investment.

208. Defendant failed to invest the Collateral in safe and prudent investments as required by the Custody Agreement, Guidelines and/or Fund Declarations. Instead, Defendant invested the Collateral in highly risky investments in direct violation of the Custody Agreement, Guidelines and/or Fund Declarations.

209. Defendant also failed to monitor the Collateral investments to ensure they were at all times proper investments in accordance with the Custody Agreement, Guidelines and/or Fund Declarations and, therefore, improperly maintained the imprudent Collateral investments.

210. No reasonably prudent fiduciary would have invested the Collateral in the investments selected by Defendant in its complete and sole discretion under the Custody Agreement, Guidelines and/or Fund Declarations, or reasonably known market conditions. Further, no reasonably prudent fiduciary would have maintained those investments. Since Defendant had a duty to act as a reasonably prudent fiduciary, it knew or at the very least should have known these facts.

211. Defendant's failure to invest the Collateral in a prudent manner constitutes, pursuant to ERISA §404(a)(1), a breach of Defendant's fiduciary duty of prudence.

212. Moreover, Defendant's actions were designed to increase profits earned by Defendant from securities lending in disregard of the risk of losses that could be suffered by the Plans.

213.    Defendant created a conflict of interest whereby Defendant disloyally placed its interests above the interests of the Plans and made a profit while the Plans suffered losses particularly as it acted as Trustee for the both the Collective Funds and the Collateral Pools in which they were invested.

214.    Defendant favored its own interests in gambling to make profits without any reasonable regard to losses that could be suffered by the Plans.

215.    Defendant earned substantial fees and profits as a result of acting in its own self-interest.

216.    By employing its "heads I win, tails you lose" investment strategy that was highly risky to the Plans for its own benefit, Defendant violated the duty of loyalty under ERISA §404(a)(1).

217.    Defendant is liable under ERISA §409, which provides:

[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

218.    Defendant is liable under ERISA §502(a)(2) to restore to the Plans all losses due to Defendant's breaches, as well as any profits that would have been earned by the Plans had the Collateral been prudently invested.

219.    The Plans face significant, irreparable harm if Defendant is permitted to continue to violate duties owed to the Plans.

220.    Further, the Plans are entitled to a declaration that Defendant's attempt to collect Collateral losses from the Plan, after losing the Plans' Collateral by its imprudent conduct in

violation of Defendant's fiduciary duties is improper and the Plans are not required to fund the Collateral losses.

**B.     Second Cause of Action:  Violation of Duty of Care and Duty of Loyalty Based on Mich. Comp. Laws §38.1133**

221.    Plaintiff repeats and realleges the allegations contained in paragraphs 1-201 as if fully set forth herein.

222.    At all relevant times, Defendant acted as a fiduciary within the meaning of Mich. Comp. Laws §38.1132c subsection 12c.(1) and §38.1133 subsection 13. (3) by exercising discretionary authority or control with respect to the investment the Collateral, a Plan asset.

223.    Pursuant to Mich. Comp. Laws §38.1133 subsection 13. (3) Defendant owed Plaintiff and the members of the Class a duty of care in its capacity as manager and trustee of Plaintiff's and the Class' investments in the Collective Funds and the Collateral Pools.

224.    This duty included the obligation to act with the same care, skill prudence and diligence under the circumstances then prevailing that a prudent person acting in a similar capacity and familiar with those matters would use in the conduct of a similar enterprise with similar aims. Therefore, Defendant was required to exercise reasonable care and prudence in the handling of investments made by Northern Trust on behalf of Plaintiff and the Class.

225.    Defendant also had a duty of loyalty to invest the Collateral solely in the interests of the Plans and their participants and beneficiaries and for the exclusive purpose of providing benefits to participants and participants' beneficiaries and defraying reasonable expenses of investing the Plans assets.

226.    To the extent that the Custody Agreement, Guidelines and/or Fund Declarations required Defendant to invest the Collateral imprudently, Defendant also had a duty to disregard those

requirements and invest the Collateral prudently. Defendant could not blindly follow those requirements if doing so would cause harm to the Plans.

227. Defendant had a duty to monitor the Collateral investments continuously to ensure that they were at all times proper. If a Collateral investment became imprudent or improper, Defendant had a duty to act immediately to protect the Plans from any investment harm by, *inter alia*, liquidating the Collateral investment.

228. Defendant failed to invest the Collateral in safe and prudent investments as required by the Custody Agreement, Guidelines and/or Fund Declarations. Instead, Defendant invested the Collateral in highly risky investments in direct violation of the Custody Agreement, Guidelines and/or Fund Declarations.

229. Defendant also failed to monitor the Collateral investments to ensure they were at all times proper investments in accordance with the Custody Agreement, Guidelines and/or Fund Declarations and, therefore, improperly maintained the imprudent Collateral investments.

230. No reasonably prudent fiduciary would have invested the Collateral in the investments selected by Defendant in its complete and sole discretion under the Custody Agreement, Guidelines and/or Fund Declarations, or reasonably known market conditions. Further, no reasonably prudent fiduciary would have maintained those investments. Since Defendant had a duty to act as a reasonably prudent fiduciary, it knew or at the very least should have known these facts.

231. Defendant's failure to invest the Collateral in a prudent manner constitutes, pursuant to Mich. Comp. Laws §38.1133 subsection 13. (3), a breach of Defendant's fiduciary duty of care and prudence.

232. Moreover, Defendant's actions were designed to increase profits earned by Defendant from securities lending in disregard of the risk of losses that could be suffered by the Plans.

233.    Defendant created a conflict of interest whereby Defendant disloyally placed its interests above the interests of the Plans and made a profit while the Plans suffered losses.

234.    Defendant favored its own interests in gambling to make profits without any reasonable regard to losses that could be suffered by the Plans.

235.    Defendant earned substantial fees and profits as a result of acting in its own self-interest.

236.    By employing its "heads I win, tails you lose" investment strategy that was highly risky to the Plans for its own benefit, Defendant violated the duty of loyalty under Mich. Comp. Laws §38.1133 subsection 13. (3).

237.    Plaintiff and other members of the Class were injured as a result of the breach and face significant, irreparable harm if Defendant is permitted to continue to violate duties owed to Plaintiff and the Class.

238.    Further, the Plans are entitled to a declaration that Defendant's attempt to collect Collateral losses from the Plan, after losing the Plans' Collateral by its imprudent conduct in violation of Defendant's fiduciary duties is improper and the Plans are not required to fund the Collateral losses.

**C.      Third Cause of Action:  Negligence**

239.    Plaintiff repeats and realleges the allegations contained in paragraphs 1-201 as if fully set forth herein.

240.    Defendant owed Plaintiff and all other members of the Class the duties set forth in the first and second Causes of Action above, as well as the duty to exercise ordinary care, skill and diligence to act so as to not cause harm to another.  These duties arose by virtue of the terms of the Custody Agreement and the nature of Defendant's relationships with Plaintiff and the Class Members.

241.    Defendant breached these duties owed to Plaintiff and the Class and were negligent by, *inter alia*: (a) failing to conduct a complete, thorough, and careful investigation into the investments which, if conducted, would have revealed, among other things, the substantial and unacceptable risk of under-collateralization that would leave Plaintiff and the Class at risk of not recovering all principal invested; (b) imprudently investing the collateral received by Plaintiff and the Class in the investments which were inappropriate and unsuitable investments for the investment of the cash collateral and which did not comply with the Guidelines and/or Fund Declarations; (c) imprudently failing to properly monitor the investments which, if prudently done, would have, among other things, revealed excessive risks; and (d) imprudently maintaining the investments after Defendant became aware or should have become aware of analysts warnings concerning the investments, their dire financial condition, and their likely failure.

242.    Defendant agreed to assume liability for losses incurred by the Plans resulting from Defendant's negligence, bad faith or willful misconduct.

243.    Plaintiff and other members of the Class were injured as a result of the breach and face significant, irreparable harm if Defendant is permitted to continue its wrongful conduct.

**D.    Fourth Cause of Action:  Breach of Contract**

244.    Plaintiff repeats and realleges the allegations contained in paragraphs 1-201 as if fully set forth herein.

245.    The Custody Agreement represents a valid and binding contract between Plaintiff and Defendant which incorporates the Declaration, Fund Declarations and Guidelines which govern Defendant's obligations and objectives with respect to investments in the Collective Funds and the Core USA and STEP pools.

246.    Defendant, as described above, breached its contractual duties under the Custody Agreement and incorporated documents by utterly failing to use the same degree of care and skill in

the exercise of its duties as a reasonably prudent expert would exercise or use in the conduct of its own affairs.

247.    Defendant breached its contractual obligations under the Custody Agreement and incorporated documents by failing to use the same degree of care and skill in the exercise of its duties as a reasonably prudent financial institution and, in so doing, made risky investment decisions that caused Northern Trust to "break the buck."

248.    Defendant breached its contractual obligations under the Custody Agreement and incorporated documents by unilaterally amending the termination provision of the Agreement and requiring a staged withdrawal from its securities lending program.

249.    Defendant breached its contractual obligations under the Custody Agreement and incorporated documents by failing to comply with the Guidelines and/or Fund Declarations, including safeguarding principal, maintaining adequate liquidity and optimizing return.

250.    Plaintiff is not in breach of any obligation of the Custody Agreement or any incorporated documents.

251.    Plaintiff and other members of the Class were injured as a result of the breach and face significant, irreparable harm if Defendant is permitted to continue its wrongful conduct.

**E.    Sixth Cause of Action:  Breach of the Implied Covenant of Good Faith and Fair Dealing**

252.    Plaintiff repeats and realleges the allegations contained in paragraphs 1-201 as if fully set forth herein.

253.    The Custody Agreement, which incorporates the Declaration, Fund Declaration and Guidelines, represents a valid and binding contract between Plaintiff and Defendant that governs the terms of Plaintiff's investment in the Collective Funds and the Collateral Pools.  An implied covenant of good faith and fair dealing arises from these contracts.  Separate and apart from the

express terms of that contract, the implied covenant of good faith and fair dealing obligated Defendant to deal honestly, fairly and equitably with Plaintiff and the Class.

254.   Defendant's conduct, as described above, breached the implied covenant of faith and fair dealing by unilaterally altering the terms under the Custody Agreement and incorporated documents, thus depriving Plaintiff and the Class of their rights under the contract.

255.   Defendant agreed to assume liability for losses incurred by the Plans resulting from Defendants' negligence, bad faith or willful misconduct.

256.   Plaintiff and other members of the Class were injured as a result of the breach and face significant, irreparable harm if Defendant is permitted to continue in its breach of its contractual obligations.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in Plaintiff's favor and in favor of the Class and against Defendant as follows:

(a)   Declaring that this action is properly maintainable as a class action, and certifying Plaintiff as class representative and Plaintiff's counsel as class counsel;

(b)   Declaring that Defendant's conduct complained of herein was in violation of its fiduciary duties owed to Plaintiff and the Class;

(c)   Ordering Defendant to promptly return all of Plaintiff's securities to Plaintiff;

(d)   Ordering an accounting;

(e)   Awarding compensatory damages;

(f)   Ordering specific performance requiring Defendant to indemnify and hold harmless Plaintiff and other members of the Class for any losses associated with Defendant's wrongful conduct complained of herein;

(g)     Imposing a constructive trust, in favor of Plaintiff and the Class, upon any benefits improperly received by Defendant as a result of its wrongful conduct;

(h)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

(i)     Granting such other and further relief as this Court may deem just and proper.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of all members of the proposed class, hereby demand a trial by jury on all issues so triable.

/s/ SHARON S. ALMONRODE

SULLIVAN, WARD, ASHER & PATTON, P.C.
1000 Maccabees Center
25800 Northwestern Highway
Southfield, MI 48037-0222
248.746.0700
salmonrode@swappc.com
P33938


PAUL J. GELLER
STEPHEN R. ASTLEY
SABRINA E. TIRABASSI
COUGHLIN STOIA GELLER RUDMAN &
ROBBINS
120 East Palmetto Park Road – Suite 500
Boca Raton, FL  33432
561.750.3000
sastley@csgrr.com
STACEY M. KAPLAN
COUGHLIN STOIA GELLER RUDMAN &
ROBBINS
655 West Broadway Street – Suite 1900
San Diego, CA  92101
619.231.1058
skaplan@csgrr.com

***Attorneys for Plaintiff and the Proposed Class***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on **April 23, 2010,** I electronically filed the foregoing paper with the

Clerk of the Court using the ECF system which will send notification of such filing to all counsel of

record**.**

/s/ <u>Sharon S. Almonrode</u>
Sullivan, Ward, Asher & Patton P.C.
1000 Maccabees Center
25800 Northwestern Highway
Southfield, MI 48075-8412
248.746.0700
salmonrode@swappc.com
P33938